JAMES H. CONNAUGHTON, Admr. of JAMES CON-
NAUGATON *vs.* ALFRED D. BERNARD, Admr.
&c., et al.

*Apportionment of Rent—Sublease—Covenant Against Other Rent—
Marketable Title—Conveyance by Administrator of two Persons—
Mortgage Sale—Failure to File Statement of Amount Due on
Mortgage—Sale of Property with Right to Build Over an Alley
—Notice of Easement—Rescinding Order Ratifying a Sale.*

In 1829 certain land in Baltimore City was leased for ninety-nine
years subject to an annual rent of $135. The lessees afterwards sub-
leased a part of it subject to an annual rent of $31, and another part
subject to a rent of $26. The owner of the second lot executed
another lease on the same, reserving a rent of $60. All the sub-
leases contained covenants against any other and greater rent. The
owners of the original reversion for more than twenty years have
collected $31 from the holder of lot No. 1, and the remainder of the
original rent from other parties to whom the residue of the original
tract had been subleased. In making the subleases, the original
lessees undertook to apportion the rent at the same rate at which
the whole lot was leased to them. No greater or other rent has ever
been demanded from the holders of these leases than that mentioned
in the subleases. The two lots above mentioned were sold by the
administrator under an advertisement, which stated that the first lot
was subject to an annual ground rent of $31, and the second to a
ground rent of $60. Upon exceptions to the sale, *Held,*

1st. That it must be assumed in the absence of evidence to the con-
trary that the owners of the original reversion had acquiesced in the
apportionment of the rent, although there was no record evidence
of the same, and that the title to the property was marketable.

2nd. That although a greater rent was reserved upon the second lot
than was mentioned in the first sublease, that fact cannot injuriously
affect the purchaser thereof, since he can see that out of the rent
paid by him the amount reserved by the first sublease is paid, the
covenants in the lease affording him ample protection, and the pos-
sibility of additional trouble not being such as to entitle him to be
relieved from the purchase.

Land which had been owned by two parties was conveyed by a per-
son who was the administrator of both of them. He signed the
deed but once, as administrator generally, but acknowledged it as

administrator of both, and the recitals showed a conveyance of the interests of both decedents under competent authority. *Held*, that the conveyance was valid.

When property is sold under an *ex parte* mortgage foreclosure and conveyed to the purchaser, after ratification of the sale and payment of the purchase money, the validity of the sale cannot be impeached upon the ·ground that no statement of the amount due upon the mortgage was filed before the sale, as required by Code P. L. L., Art. 4, sec. 703.

An advertisement of a sale of property, one parcel of which was upon a three-foot alley, stated that the purchaser would have a right to build over the alley at the height of eight feet, provided the use thereof was not interfered with. Upon exceptions to the sale, *Held*, that even conceding that the purchaser was not entitled to build over the alley, yet that would not justify the Court in setting aside the sale, but would at most only entitle him to a rebate of the purchase money.

The former owner of a lot sold under a decree had reserved to the owner of an adjoining lot a right of way for passing coal, &c., to his lot, and also an outlet for water across the first lot to an alley. There was a pipe laid from the second lot, which was on the surface of the first and plainly visible, and a door in the wall between the two lots. For the last forty years the right of way had only been used for the purpose of cleaning out the sink in the second lot and as an outlet for water to the alley. The purchaser of the first lot examined the premises and had notice as to the existence of the easement. *Held*, that in the absence of evidence showing that he was misled in any manner, the sale should not be rescinded.

After a sale of property under a decree has been ratified, the Court has power to rescind the order of ratification if the proceeds of sale are still within its control, and will do so if any injustice would be done to the purchaser by compelling him to take the property.

Appeal from an order of the Circuit Court of Baltimore City, (HARLAN, C. J.), dismissing the appellant's petition asking for a rescission of the final order of ratification of the sale reported in this case, and overruling the exceptions thereto. The advertisement referred to in the opinion of the Court was as follows :

" By virtue of a decree of the Circuit Court of Baltimore City, the undersigned trustee will sell by public auction on the premises, on this day, November 7, 1895, at 4 o'clock, P. M., all those two·lots of ground situate in Baltimore City

and described as follows : Beginning for the first of said lots at the northeast corner of Light and York streets, and running thence northerly 15 feet 6 inches, with an even depth of 48 feet, binding on the north side of York street, to an alley three feet wide. Beginning for the second of said lots on the east side of Light street 15 feet 6 inches northerly from York street, and running thence northerly, bounding on the east side of Light street, 13 feet, with an even depth of 48 feet, to an alley 3 feet wide. Both lots together are improved by a large and substantial three-story brick building covering the two lots, and known as Nos. 625 and 627 Light street. The property is now used as a saloon and dwelling, the same having been erected by the late Martin Reddington for that purpose. This property, which will be sold as a whole, is subject, as to the first lot, to an annual ground rent of $31, and as to the second lot, an annual ground rent of $60.

" Immediately after the sale of the above property the same trustee will sell at public auction all that lot of ground and premises situate on the north side of York street, in said city, at the distance of 52 feet 2 inches easterly from Light street, and running thence easterly, on the north side of York street, 15 feet ; thence northerly, parallel with Light street, 67 feet 6 inches ; thence westerly, parallel with York street, 15 feet, to an alley three feet wide ; and thence, binding on said alley (with the right to build over the same at a distance of eight feet from the ground), 67 feet 6 inches, to the place of beginning. Improved by a two-story and attick brick dwelling. Ground rent $45 per annum. This property is especially valuable as a means of enlarging the building on the corner. Terms of sale," &c., (as in the decree).

The trustee sold all of the above-mentioned property to Connaughton for the sum of $7,000, and the sale was ratified by the Court.

The cause was submitted to the Full Bench on briefs filed by

*N. Rufus Gill & Sons,* for the appellant.

The offer of the intestate upon which the sale was reported to the Circuit Court upon its face states, that the lots are "To conform in size and be subject to the ground rents set forth in the advertisement," which was affixed to and made a part of the report. By the advertisement " Lot No. 1 " on plat, 15 feet 6 inches by 48 feet is said to be subject to an annual rent of $31.00, and " Lot No. 2 " on plat, 13 feet by 48 feet, is said to be subject to a rent of $60.00.

The first question presented is : Are Lots Nos. 1 and 2 subject to the rents named, and none other ? It clearly appears from the admitted facts in the record, that these two lots are parts of a large lot originally leased January 12th, 1829, at an annual rent of $135.00 ; that " Lot No. 1 " was subleased at the rent of $31.00, and " Lot No. 2 " was first subleased at a rent of $26.00, and that the sublessee under the lease creating that rent, subleased that lot at an annual rent of $60.00. It is insisted as to these lots that by the conveyances resorted to, the title is not only placed in confusion as to what may be demanded for ground rent by the original lessor and the owners of the subreversions outstanding, but there is a strong probability that the owner of the title tendered will be put to great inconvenience, litigation and loss, and that such a title is therefore not merchantable, or such as a Court of Equity will compel a purchaser to take. As to " Lot No. 1," it is contended there has been an apportionment of the original rent, but the original lessor, nor those claiming under him, are not parties to this case and no ruling here upon that question can bind them, or protect the purchaser from their demand for the whole rent, $135.00. But, " Lot No. 2 " is not only in the same situation as to the original or $135.00 rent, but is also charged with the payment of a rent of $26.00 under the first sublease and of $60.00 under the second underlease ; and, while there are covenants against other rents in both of the sub- . leases, there is no covenant of indemnity against other rents charged upon it, nor has the sublessee in these last leases

any right to appropriate the rent to discharge the original or first subrent, if the owner of the subreversion fails to pay; he may, therefore, be compelled to pay both rents and be put to litigation, trouble and expense to secure indemnity. The subleases should have stipulated for such indemnity. *Taylor's Landlord and Tenant*, section 110.

Again, the sub-reversion in " Lots Nos. 1 and 2 " is outstanding in " Carson and Taylor " (original lessees); and the original term under lease to them is to expire in 1928, when a renewal must be demanded. Who is to demand and who may require a renewal of the original term, and who is to protect holder of the sub-leasehold title and secure him a renewal ? There being no privity of contract between the owner of the original rent and the sub-leasehold owner, he cannot demand a renewal of the lease. *Taylor's Landlord and Tenant*, sec. 109 and 448.

The deed of John V. L. Graham, administrator, to Joseph Hopkins of " Lot No. 1," was defectively executed and did not convey a perfect title, because being administrator of two decedents, he was, for the purposes of that conveyance, acting in the dual capacity of administrator for each, and could only convey the interest he represented by signing and sealing twice. *Code*, Art. 21, sec. 10; *Jones on Real Property*, sec. 105.

The proceedings of foreclosure in *Liberty Building Association No. 3* v. *Hartker* were defective. The decree authorized a sale after default; under the statutes the filing of a sworn statement of claim by mortgagee is made necessary before sale. No such statement was ever filed in the case referred to, and there is no evidence in the proceedings that the mortgagor ever made default. If he did not, how can it be said a good title passed by the trustee's deed in the proceedings where the decree is *ex parte*. Though this Court has held that the statement of claim may be filed after sale, but before ratification, it is submitted a good title could not be given in a case where no such claim was ever filed. *Code P. L. L.*, Art. 4, sec. 703 ; *Gatchell* v. *Presst-*

*man,* 5 Md. 163; *Robertson* v. *American Bldg. Assn.,* 10 Md. 406; *Eichelberger* v. *Harrison,* 3 Md. Ch. 40.

The easement of the abutting owner across " Lot No. 3" is fully established and undoubted, and was not mentioned in the advertisement or disclosed to the purchaser. It is a valuable right and will interfere and prevent future improvement upon that lot. The three lots were sold as one property and it is no answer to the exceptions to say that that lot is of small value comparatively; the purchaser is entitled to all he bought clear of all incumbrances or easements in others. *Baker* v. *Frick,* 45 Md. 340.

It is also clear from the admitted facts in the record, page 31, that the right to build over the alley in the rear of "Lot No. 1," which was particularly mentioned in the advertisement as a right belonging to " Lot No. 3," does not in fact exist. It is nowhere mentioned in the conveyances except in the deed from Healy to Reddington, but it is insisted and clear from the record that the grantor in that deed could grant such right only so far as his easement in the alley extended, and it is submitted, the appellant can not exercise that right without the consent and release of all the other abutting owners upon the alley having the right to use it, and * * * it is not pretended that such assent or release has ever been given. *Bump* v. *Sanner,* 37 Md. 621; *Van Witsen* v. *Gutman,* 79 Md. 405.

It is settled in this State that an administrator stands in the place of his decedent, with right to prosecute all proceedings at law or equity to secure the interest of the estate. *Donohue* v. *Daniel, &c.,* 58 Md. 601; *Williams on Executors,* vol. 3, p. 481, 7th Amer. ed. The sale in this case was ratified by the Court as of course under its practice, but the fact is that counsel for the purchaser was then engaged in examining the title, had not approved it, and the purchaser promptly, not only within the term, but ten days after the passage of the order, filed his petition asking to have the order rescinded and the sale set aside; it is settled that objections to sales may be filed and insisted

upon as well after ratification as before, if the proceeds are yet in the control of the Court. *Glenn* v. *Clapp*, 11 G. & J. 1 ; *Preston* v. *Frey*, 38 Md. 224. It is submitted that the titles to the property in question are not such as a Court of Equity will compel a purchaser to take. *Gill* v. *Wells*, 59 Md. 494 ; *Emmert* v. *Stouffer*, 64 Md. 554 ; *Stewart* v. *Devries*, 81 Md. 526.

*Richard Bernard* and *Alfred D. Bernard* for the appellees.

It is objected by the appellant that the lots sold are subject to greater rents than those set out in the advertisement. The only greater rent that ever existed was the original rent of $135, covering 67½ front feet, which has been apportioned at the rate of two dollars a foot, thirty-one dollars having been collected by the holders of the original rent from the occupants of the corner lot, probably since the date of the sublease, certainly for more than twenty years, and separate and distinct receipts given therefor in the same manner as if the title rested on an original lease for that amount. In like manner twenty-six dollars was apportioned on the adjoining lot, it being thirteen feet front. *Both these rents are payable on the same day the original rent is payable,* the leases being so worded that the rent may be paid to the holder of the original reversion.

*The sixty-dollar rent is also payable on the same day the other rents are payable.* It is conceded that the conveyances—reserving the $26 and $60 rents on lot No. 2, contain covenants for perpetual renewal. In point of fact the twenty-six-dollar rent is really a part of the sixty-dollar rent. The holder thereof virtually says to the lessee every six months : I want thirty dollars, thirteen for our landlord and seventeen for myself. The means of protection is always in the lessee's own hands. Under the covenants in his title the sixty-dollar rent is collectible only on condition that the person paying it is protected from the necessity of paying any other rent. The default of the sub-reversioner can work no injury to his lessee. If the sub-rent was smaller

than the original rent as apportioned, the case would be different, and the contention of the appellant would be tenable.

It is well known to this Court that a large portion of the property in Baltimore City is constantly being sold, the title to which is held subject to the payment of apportioned rents. Sometimes it is sold clear of any rent or subject merely to nominal rents where the original rent has been shifted on a portion of the property originally leased. No one doubts that such property is marketable. The question of the apportionment of such rents has been fully considered by this Court in the case of *Ehrmann* v. *Mayer*, 57 Md. 612, where it has been held that they are a rent service and apportionable.

In *Speed* v. *Smith*, 4 Md. Ch. 309, trustees in insolvency sold property representing the same to be subject to the yearly rent of $10.00. Exceptions to the ratification were filed in due time. It was shown that the lot sold was a part of a lot leased over fifty years before by John Eager Howard, subject to a rent of $20.00. There was no evidence that the title to this rent passed from Howard. Neither was there any record evidence of apportionment. There was evidence, however, showing that an annual rent of $10.00 had been paid on the lot sold for six or seven years, and receipts exhibited for that amount. There was no proof that the particular lot of ground sold was held liable for the rent of $20.00. It was held that the burden of proof was upon the exceptant to show that it was, which he had failed to do. It was further held that it could be assumed that the original rent had been apportioned. In the late case of *Barnitz* v. *Reddington*, 80 Md. 622, there was no proof that the original rent created by the lease from Edward Hanson had been extinguished; but there being evidence that no part of that rent had been collected for many years from the holders of the lot sold, it was held, following the authority of *Speed* v. *Smith*, that it could be presumed that the original rent had been apportioned on other portions of the lot originally leased.

We submit that there is no evidence showing that the oc-
cupants of these lots were ever called upon to pay greater
rents than those set out in the advertisement.   On the con-
trary, the facts in this case show conclusively that the orig-
inal rent has been apportioned ; that it is not competent for
the reversioners to collect more than $31.00 from lot No.
1, nor more than $26.00 from lot No. 2 ; that as a matter
of fact, the $26.00 rent is really a part of the $60.00 rent ;
that the covenant of the lessee to pay and the covenant of
the lessor to protect the lessee are inseparable ; and that
the lots sold are not and cannot be subject to greater rents
than those set out in the advertisement of sale.   What was
once an important question relating to this class of titles,
viz., how to get the lease renewed, is no longer asked.

Following the reasoning of this Court in *Banks* v. *Haskie*,
45 Md. 207, the Legislature, by the Act of 1886, ch. 154,
Code, Art. 21, sec. 87, has made all such leases self-renew-
ing.   So that the estates thereby created are as they were
intended to be, perpetual.

If it be urged that the rents collected on lots Nos. 1 and
2 are not original rents, we answer that the trustee did not
represent the rents to be original ; the purchaser whose
offer was dictated by counsel should have so stipulated, but
did not.   The offer to purchase at private sale was deliber-
ately written when the purchaser appeared to believe the
proceedings were improper in the office of his counsel
within a few hundred yards of the record office, where he
could learn all about the title before becoming an impedi-
ment to other purchasers.   Indeed it is alleged, and not
denied that he had already tried to purchase the mortgage
on the property for the purpose of foreclosing it from a
mortgagee which declined to forclose or sell it for any such
purpose.

It is also urged for the first time by the purchaser's ad-
ministrator that lot No. 3 was sold with the right to build
over the three-foot alley to the west thereof, but that no
such right exists.   The evidence shows that Reddington

did build over this alley a structure used to connect the second stories of the houses on lots Nos. 1 and 3, which was continued without objection from any one until the old house on the corner lot was torn down. And that since the erection of the new building on the corner lot such connection became impracticable, the height of the first story of the new corner house being about fifteen feet, whereas the first story of the old house, like that now on lot No. 3, was only about eight feet.

We submit that the right to build over a private alley at such a height as not to interfere with the ordinary uses thereof, is a right that always follows the acquisition by the same owner of the property on both sides of the alley ; and such rights are constantly exercised. Who could prevent it ? Not the reversioners. All they can claim is the rent. What easement could the other persons using the alley have, that building over it at the height of eight feet would obstruct or impair ? The language of the grant is " and with the right of building over the said three-foot alley, provided the use thereof is not interfered with." Whatever is built over it must rest on the walls of the respective houses the three-foot alley remains. *Washburn on Easements*, 4 ed., star 196.

It is also urged by the appellant that the ratification of the sale should be rescinded, because in the chain of title to lot No. 3 there is a deed reserving to a certain Mrs. Ryan the free passage across said lot to the alley for water, wood, coal, &c. While these things no longer pass across the lot, and the grantor in that deed could not give her neighbors the right to use the alley, there is evidence that there is a door in the wall dividing this lot from the lot adjoining on the east, used on rare occasions by the occupants of the lot adjoining, to pass across this lot. There is also a drain pipe leading from the lot on the east to the alley, which is exposed on the surface of the yard. It has been shown that lot No. 3 is of very little value ; therefore the real inducement to purchase must have been the corner property

It has been shown that the door and also the drain pipe just mentioned can be seen by anyone who chose to examine the property ; and the purchaser had every opportunity to make a thorough examination of its physical condition. His administrator alleges that his decedent did not know of the defect just mentioned at the time of the purchase. Of course it is impossible for this administrator to know this. But even the administrator does not undertake to say that the purchaser did not know of it before the sale was ratified.

It seems apparent from the record that what the purchaser really wanted, and seemed determined to have, was the corner property, with its business, and that the only thing which troubled him was whether the rent of $135.00 had been apportioned ; or, in other words, whether the lots were liable for greater rents than those set out in the advertisement. We submit that, even if the last-mentioned ob·jection was urged before the ratification of the sale, the worst effect it could have would be a slight reduction in the purchase money. The sale would not be set aside for so slight a defect in so unimportant a part of the property sold. It could not materially lessen the value of this lot if the three-foot alley was continued from its present terminus to the lot adjoining to the east. If a sale thus made and ratified is to be stricken down it must be because it would be against conscience to uphold it. *Foley* v. *Crow*, 37 Md. 57.

But the appellant insists that there is one defect in the title which is not slight or trivial, affecting an important part of the property, viz., lot No. 2, growing out of the foreclosure proceedings already mentioned. He contends that because the mortgagee failed to file his claim duly sworn to, the proceedings were void and the purchaser took no title. Consequently, Reddington was without title to this lot, although the property was conveyed to the purchaser at the sale by deed executed about twenty-five years ago, and if the appellant is in error in this contention he insists that nothing short of a decision of this Court will insure his safety. It will be seen by the agreed statement of facts that

there was at the time three mortgages on the property, one of which was duly released. That the second mortgagee, at whose instance the decree was passed in pursuance of the Public Local Laws of Baltimore City, did not file a sworn statement of his claim. It seems that the first mortgagee intervened and filed its claim. Even if we assume that the filing of its claim, duly sworn to by the first mortgagee, did not help the matter, it seems that this Court came very near deciding this identical question in the case of *Gatchell* v. *Presstman*, 5 Md. 161.

But, if this case is not conclusive of the question, we submit that, upon general principles, the contention of the appellant is unsound. It must be conceded that if instead of being an *ex parte* proceeding, in pursuance of this statute, the foreclosure was by bill, and all parties in interest were before the Court, and the decree provided for the filing of a sworn statement of the mortgagee's claim before sale, that the failure to do so would not, after the final ratification, affect the purchaser's title. *Newbold* v. *Schlens*, 66 Md. 585. But the appellant contends that no such result follows the ratification of a sale made in pursuance of these statutes.

We submit that it is too late to urge upon this Court the narrow construction of these statutes contended for. In *Cockey* v. *Cole*, 28th Md. 282, it was said: "The Court in which these proceedings took place was not one of special or limited jurisdiction, but of general common law and chancery powers. Foreclosure of mortgages and the execution of trusts were subject-matter peculiarly within its jurisdiction and power, and the statute simply provided a summary mode for the exercise of an ordinary jurisdiction." This case grew out of a proceeding to foreclose a mortgage under the Public General Law, the defect being the failure to file a bond. The same rule of construction was applied in the case of *Wareheim* v. *Carroll Co. Buildg. Asso.*, 45 Md. 517, where the advertisement of sale failed to comply with the requirements of the mortgage.

There can be no reason why this Public Local Law should not receive the same liberal construction, and that the failure of the mortgagee to file his claim should be treated as a mere irregularity ; a proper ground of objection before ratification ; but no ground for objection to the purchaser's title after the sale has been ratified.    Indeed, it will be seen, that the Legislature, in providing this Public Local Law for the summary foreclosure of mortgages, also provided that " such sales and conveyances thereupon, shall have the same effect if finally ratified by said Court, as if the same had been made under decree between the proper parties in relation to mortgages, and in the usual course of said Court." (Public Local Laws, vol. 1, Art. 4, sec. 694).  *Morris* v. *Gelston,* 34 Md. 420.

BOYD, J., delivered the opinion of the Court.

This case comes before us on an appeal from the action of the Court below in refusing to rescind an order of ratification of a sale made by Alfred D. Bernard, trustee, to James Connaughton, the appellant's intestate.   Mr. Bernard filed a report in which he stated that he had offered the property at public auction, but not having received an adequate bid had withdrawn it, and that Connaughton had made an offer in writing for the three properties embraced in the decree, which are referred to in his offer as " Nos. 625 and 627 Light street, and No. 100 E. York street, the lots to conform in size and be subject to the ground rents as set forth in the advertisement of said property in the ' Sun' of November 7, 1895, a copy of which is hereto affixed."   The sale thus reported was finally ratified, after due publication of the order *nisi*, no objections having been filed.   Ten days afterwards Connaughton filed a petition asking the Court to rescind the final order of ratification, on the ground that the titles to the three lots were defective and the sale was inadvertently ratified.   The appellant filed " additional exceptions to the sale," James Connaughton in the meanwhile having departed this life.   That was done

with leave of the Court, and the exceptions, as they were called, were treated as additional reasons for rescinding the order of ratification of the sale.

When a sale has been ratified, after publication of the order *nisi* in accordance with the established practice of Courts of Equity, the facts relied on by one seeking to have the sale set aside must be very clearly established and must be of such character as strongly appeal to the conscience of the Court. But when the Court can see that injustice will be done a purchaser by compelling him to take the property, it has the power to rescind the order of ratification, if the proceeds of sale are still within its control, provided the purchaser has not by his conduct or neglect deprived himself of the right to relief. We will therefore inquire into the circumstances surrounding this case to ascertain whether the appellant should be relieved of the purchase made by his intestate.

A number of objections have been urged to the titles and we will consider them in the order they are presented in the appellant's brief. The two lots fronting on Light street are designated on the plat filed in the case as Nos. 1 and 2. No. 1 is on the northeast corner of Light and York streets, having a front of fifteen feet six inches on the former and forty-eight feet on the latter. No. 2 adjoins No. 1 on the northerly side, fronts thirteen feet on Light street, and has a depth of forty-eight feet. In the rear of those two lots there is an alley three feet wide, and just beyond the alley is lot No. 3, fronting fifteen feet on York street, and having a depth of sixty-seven feet and six inches, running along the alley for its whole depth. Nos. 1 and 2 are parts of a lot which fronted sixty-seven feet and six inches on Light street, with a depth of fifty-one feet on York street and which was leased in 1829 by Louisa Armistead to David Carson and David Taylor, for ninety-nine years, renewable for ever, at the annual rent of $135.00. Afterwards Carson and Taylor subleased the portion of the original lot contained in No. 1 at the annual rental of $31.00. They also subleased

the part of the original lot included in No. 2 at an annual rental of $26.00, and this sublease became vested in one Jane Bell, who, together with her husband, executed on August 8, 1865, another lease of that lot, reserving the annual rent of $60.00. The several subleases contained covenants against any other or greater rent than that reserved by them. It is insisted on the part of the appellant that the advertisement of the lots did not properly state the facts and that the titles to these two lots are not marketable, or such as a Court of Equity will compel a purchaser to take, because they are subleases and not original leases. The only reference to the rent in the advertisement is " this property (referring to Nos. 1 and 2) which will be sold as a whole, is subject as to the first lot to an annual ground rent of $31.00, and as to the second lot an annual ground rent of $60.00." It is evident that the original lessees undertook to apportion the rent, as they subleased lots 1 and 2 at the same rate the whole lot was leased to them—two dollars per front foot. While there is no positive evidence in the record that Louisa Armistead consented to such an apportionment, there is a circumstance which tends to show she had acquired some interest in the alley which Carson and Taylor laid out on the property which she had leased to them. The agreed statement of facts says, " It is also agreed that in the original lease of lot No. 3 the right to use the 3-foot alley was granted by Louisa Armistead." The testimony of Mr. Gill shows that that lease was made March 20, 1847. She had in 1829 leased to Carson and Taylor fifty-one feet on York street, which included the land embraced in the three-foot alley. When Carson and Taylor made the subleases they called for the alley and only included forty-eight feet in depth along York street in their leases. It is therefore altogether probable that Louisa Armistead did make some arrangement with the original lessees by which she acquired some interest in the alley, and acquiesced in the apportionment of rent made by them. This circumstance must be considered in connection with

the fact that there is not the slightest evidence or suggestion that any more rent was ever exacted or demanded from the holders of those lots, by the owners of the original reversion, than the sums named in the leases made by Carson and Taylor. On the contrary, it is admitted that the ground rent of $31.00 on lot No. 1 has been collected by the successive owners of the original reversion for more than twenty years and that they collect the remainder of the original rent from one Mary Ann Brack's estate, which collects in turn four subrents of $60.00 each from the four houses and lots on Light street, just north of the corner lot, and included within the bounds of the original lease from Louisa Armistead to Carson and Taylor. Each of said four lots has a front of thirteen feet and the leases for them contain covenants against the payment of any other or greater rents. There cannot therefore be any such substantial objection urged against the title to these lots by reason of the fact that they are subleases as would prevent them from being marketable. The ground rent system that has prevailed so largely in this State, especially in the city of Baltimore, has been productive of much litigation and in recent years of considerable legislation, looking to the correction of some of the evils and troubles that have arisen, but if this Court sustained the position taken by the appellant in reference to these lots it would create greater confusion, as we know from the cases that have been in this Court, as well as the history of the city, that some of the most valuable property in Baltimore is held under subleases and that there is no record evidence that the rents reserved in many of them have ever been apportioned. In *Speed, Trustee,* v. *Smith,* 4 Md. Chy. 299, the advertisement stated that the property sold was subject to a ground rent of " only ten dollars." The purchaser excepted to the sale and produced a lease of property of which that sold was a part, wherein a rent of twenty dollars per annum was reserved. There was no evidence that the particular parcel sold was ever held for the twenty dollars rent, and

the Chancellor decided that the mere production of such a
lease, which was over fifty years old, did not sustain the
exceptant's case without some proof that the rent reserved
had been exacted from the owner of the part sold. But,
on the contrary, he was of the opinion that there was an ap-
portionment of the original ground rent which had been
acquiesced in by those claiming under the original lessor.
That case was affirmed in *Barnitz* v. *Reddington,* 80 Md.
622, where, as there was evidence to show that for more
than fifty years no other rent than that named in the sub-
lease had been demanded, the Court held that it was
reasonable to conclude that the lot was not liable for any
other rent and that there had been an apportionment of the
rent reserved upon the original tract of which the lot in
question was a part. So, in this case, without some
evidence to the contrary, we must assume that the owners
of the original reversion have acquiesced in the apportion-
ment of the rent originally reserved between these five lots.

The fact that a greater rent has been reserved on lot No.
2 than there was in the first sublease cannot materially in-
jure or affect the holder of the present leasehold interest.
He can see that out of the $60 to be paid by him, the
$26 reserved by Carson and Taylor is paid to the
holders of that or the original reversion. The covenants
in the leases fully protect him from any loss on that account
and the possibility of additional inconvenience or trouble
that he might have for his own protection would not be
such a burden as to entitle him to be relieved from a pur-
chase such as that made by Connaughton.

One of the deeds in the chain of title for lot No. 1, was
executed by John V. L. Graham, who was administrator of
Frank M. Hopkins and also of Ida S. Hopkins. It is ob-
jected to because it was simply signed John V. L. Graham,
administrator, and only signed once. It would have been
more regular for Mr. Graham to have signed twice—as ad-
ministrator of each of his intestates—but the recitals show
that as administrator of Frank M. Hopkins he had, under

authority of the Orphans' Court, sold his interest, and as
administrator of Ida S. Hopkins, he had, by the same au-
thority, sold her interest.   He, as administrator of each of
them, was the grantor and conveyed "all the right, title,
property, claim and demand of the said Frank M. Hopkins
and Ida S. Hopkins," etc.   The deed was acknowledged
by John V. L. Graham, administrator of Frank M. and
Ida S. Hopkins, and there can be no question as to what
he intended when he signed simply as administrator.   The
deed itself cannot be read without it being manifest that he
was administrator of both and conveyed the interests of
both in this lot.

The next objection urged is that the title to lot No. 2 is
defective by reason of the failure of the Liberty Building
Association No. 3 to file a statement of the amount due it
on a mortgage which it held and under which this lot was
sold.   The agreed statement of facts showed that one Fred-
erick Harker became the owner of that lot and gave a
mortgage to the Building Association, which contained his
assent to the passage of a decree for the sale of the mort-
gaged premises under the provisions of Art. 4, section 692,
etc., of the Local Code.   A decree was passed by the Cir-
cuit Court for Baltimore City for the sale of the mortgaged
property in which a trustee was appointed to make the sale
"at or after any one of the periods limited in the mortgage
filed for the forfeiture of said mortgage."   The trustee sold
the property to the mortgagee, reported the sale to the
Court, and it was ratified, but the docket of the Court does
not show that any statement of the mortgagee's claim was
filed either before or since the sale.   It is contended by the
appellant that this omission made the sale void.   We do
not think, however, that it can have such an effect.   The
jurisdiction of the Court was not dependent upon the filing
of said claim, but the Court had jurisdiction of the subject-
matter and also of the parties by reason of the assent given
to the passage of the decree.   The title passed through the
decree of the Court, which authorized its agent, the trustee,

to make the sale, and not through the *ex parte* statement of the mortgagee. It was held as early as the case of *Hays* v. *Dorsey*, 5 Md. 99, that the affidavit and statement of the amount due could be filed after the decree, as the statute only required it to be filed before the sale. It would, therefore, be an anomalous condition of affairs if this *ex parte* proceeding of the mortgagee *could confer jurisdiction* on a Court of Equity or if the mortgagee could take it away by not filing the statement. That was never intended by the Legislature.

As the statute requires the statement to be filed before sale, the Court on having its attention called to the omission ought to refuse to ratify a sale, if it is not so filed. That was so held in *Gatchell* v. *Presstman*, 5 Md. 161, but the Court in referring to this question said that "when due notice, in the usual manner, has been given, affording an opportunity for objections to be made and none are presented, from any quarter, if the sale is finally ratified, being then a judicial sale, consummated by a Court of competent jurisdiction in the premises, it might well be considered too late, then, to make such an objection as the one now relied upon." If it is not filed the Court might very properly, even after the sale was ratified, rescind the order of ratification upon application being made within such time as it would be proper to exercise that power, but in this case the sale was made some time prior to June 16, 1873 (the exact date does not appear in the record), and there is no evidence that any such application was ever made or any question raised as to the regularity of the proceedings. It is too late to raise it now.

It will not be out of place to say that as it is admitted the proceedings in the mortgage case were never recorded, the appellee should have them recorded and pay the costs out of the proceeds of sale, if they cannot be collected from the proper party.

Two objections are urged against the title to lot No. 3. It is contended that the sale should be set aside because

there is no authority of record to build over the alley as the advertisement stated could ·be done, excepting in the deed to Martin Reddington from Thomas Healey, which is dated April 16, 1884. Mr. Gill, a member of the bar of Baltimore City, testified that he had examined the title, and in answer to the question as to what the records disclosed as to the right to build over the alley said, " This right does not appear in any of the papers by which the title is held from the lease from Louisa Armistead on March 20, 1847, until the deed from Thomas Healey to Martin Reddington on April 16, 1884; this last mentioned paper being the only one in which the right is mentioned, as far as I have been able to discover from the papers found of record." That testimony was not objected to and we presume was admitted in that way to avoid expense of filing copies of the title papers. The evidence seems to be confined to . the title papers of lots 1, 2 and 3, and we are not informed by the record what rights to this alley, if any, are vested in the owners of any of the other lots bordering on it. But at the time of the sale the improvements on No. 3 did not extend over the alley, and therefore cannot be affected by this question as they now stand. It is true that the owner of the lot may at some time desire to rebuild or remodel the house now thereon, but if it be conceded for the purposes of this case that he could not safely build over the alley, that would not justify the Court in setting aside the sale, as at most it would only entitle the purchaser to a rebate of the purchase money. But the possibility of the owners of any of the other lots interfering is exceedingly remote. The privilege attempted to be given by Healey to Reddington was " the right of building over the said three-feet alley, provided the use thereof is not interfered with, such privilege being over an arched way not less than eight feet high." As Connaughton by his purchase became the owner of twenty-eight feet and six inches on one side of the alley, and sixty-seven feet and six inches on the other, any improvements over the alley, at least eight feet high, would not likely in-

terfere with the use of it, but if they did, then by the very terms of the deed they could not be made, because it only attempted to grant the use, " provided the use thereof is not interfered with." There is nothing in the record to sug- gest that when the alley was built over as it was before the present improvements on lots No. 1 and 2 were made, any objection was made to it. When Connaughton filed his petition asking the Court to rescind the sale he did not ob- ject to the purchase on this account and did not intimate that he had been in any way misled by the advertisement or anything the trustee said or did, excepting as to the rents the properties were liable for.

Another objection urged is that there was reserved to a Mrs. Ryan, by the former owner of lot No. 3, the right of way across this lot for a passage from the alley to her lot " for the purpose of passing wood, coal and other necessaries into the first mentioned premises, and also an outlet for water therefrom into said alley." The lot in which Mrs. Ryan was interested had been conveyed to a trustee for her benefit by the persons who were also the owners of lot No. 3. The evidence shows that there is a pipe leading from the premises formerly owned by Mrs. Ryan to this alley to carry off the water, which is on the surface and plainly visible. There is also a door in the wall between the two lots. The property was offered at public auction on the premises and was examined by Mr. Connaughton, who was present and a bidder at the sale. There is no particular place designated where the right of way should be, and if it be conceded that the present or future owner of the Ryan lot can maintain the right to have this way, it can only be used in a reasonable manner and in such manner as will not unnecessarily interfere with the use of lot No. 3 by the owner of it. The evidence shows that since 1855 the pres- ent owner has only used it to clean out his sink and as an outlet for water to the alley. Mr. Connaughton did not urge this as one of the objections to the title, and there is nothing to show that he was not aware of this easement be-

fore he purchased the property, whilst there is some evidence to the effect that there was enough to put him on inquiry about it.     In fact there is a total failure of evidence to show that he was in any way misled by the trustee or that he was not fully aware of the condition of the title to the lot with reference to building over the alley, as well as what is termed the Ryan easement.     Without some evidence to that effect the Court would not have been justified in refusing to ratify the sale, if objection had been made before that was done, and there is all the stronger reason why it should not rescind an order previously passed after notice had been given in accordance with the established practice of the Court.

We have not deemed it necessary or proper to pass upon the rights of persons not parties to this proceeding to the alley or the easement above referred to, and have therefore purposely refrained from doing so, as we think the appellant has failed to show such a condition of affairs as would authorize the Court to set the sale aside.

Having considered all the objections to the titles urged before us and being of the opinion that the petition to rescind the order of ratification ought not to have been granted, the order of the Court below must be affirmed.

*Order affirmed with costs to the appellee.*