## LOUIS HURWITZ et al.

### vs.

## HAMMOND J. DUGAN et al., Executors.

*Apportionment of Ground Rent—Specific Performance— Parties.*

Where the owners of a ground rent collected it for twenty years in two parts from separate owners of distinct portions of the leasehold, never undertaking to collect more from either, there was an implied consent by such owners of the ground rent to the apportionment of the rent, estopping them, and also future owners, from questioning it.       p. 174

For the purpose of a judicial determination of the marketability of the title to leasehold property, as dependent on the amount of rent, the owner of the rent is not a necessary party to the proceeding.       p. 175

*Decided April 20th, 1922.*

Appeal from the Orphans' Court of Baltimore City.

Petition by Hammond J. Dugan and the Safe Deposit and Trust Company, Executors of John Fitzberger, deceased, praying for a resale of property previously sold to Louis Hurwitz and Benjamin Voloshen. From an order granting the prayer of said petition, said purchasers appeal. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*A. Herman Siskind* and *Louis J. Jira,* with whom was *George J. Tinsley* on the brief, for the appellants.

*Randolph Barton, Jr.,* with whom was *Ferdinand C. Dugan* on the brief, for the appellees.

ADKINS, J., delivered the opinion of the Court.

On April 13th, 1921, appellees sold to appellants two leasehold lots known as Nos. 119 and 121 W. Mulberry Street at public auction, said lots having been described in the advertisement as "119-121 W. Mulberry Street (between Cathedral Street and Park Avenue), having a frontage of about 29 feet 10 inches with a depth of about 47 feet 7 inches to the south side of alley, ground rent $70; with right to collect $35 from the adjoining property on the west, improved by a two-story property divided into two stores."

The sale was finally ratified by the Orphans' Court of Baltimore City on May 17th, 1921, no objections having been filed.

Subsequently, however, the purchasers were advised by the Maryland Title Guarantee Company that it could not guarantee the marketability of the property because of an original ground rent of $132 covering this and other property. As to this ground rent, the company wrote Louis Hurwitz, one of the appellants, as follows:

> "It appears that an attempt was made by the owners of the original leasehold interest to apportion the original yearly rent of $132.00, but inasmuch as they did not obtain the assent of the owners of said original rent to make such an apportionment, we do not feel at this time we can guarantee that the lot under examination will not be called upon to pay the entire original rent."

It is admitted, however, by appellants that the company subsequently offered to guarantee that no greater rent than $70 can be collected from the property, but not to guarantee the marketability of the title so far as concerns its liability for only this amount of ground rent.

Appellants therefore refused to comply with the terms of sale, whereupon, on petition of appellees, the orphans' court, after taking testimony, ordered a resale at the risk and cost of appellants. This appeal is from that order.

There does not seem to be any disposition on the part of appellees to rely upon the failure of appellants to file exceptions in proper time, nor on the part of appellants to avoid their obligation to take the property if they can get a marketable title.

The real question, therefore, is whether the owners of the original rent of $132 are estopped to collect more than $70 yearly from the property sold appellants under the advertisement above referred to.

Appellees are executors of the will of John Fitzberger, but in the sale of said property were acting as administrators *pendente lite.* The executors of Cumberland Dugan, in 1915, assigned two lots, of which the property in question is a part, to the said Fitzberger, describing them as one lot, subject to a total rent of $70 due September 1st in each year, and Fitzberger subleased about half of the said lots to J. Frank Purzer, reserving a rent of $35.

The two lots had been assigned to Cumberland Dugan by Bernhart Himmelreich in 1865, Himmelreich having taken them by assignment from William Garritee in 1856, and Garritee from Gabriel D. Clark in 1855. Clark obtained them by two subleases from Durius Carter in 1853, in which rents of $25.50 and $44.50, respectively, were reserved.

This appears to have been the beginning of this form of transfer of any of the portions of the original lot covered by the $132 rent.

There is no evidence that these, or any, rents were ever paid to Durius Carter, or that he ever undertook to dispose of any interest reserved to him by said subleases, or that his next of kin ever asserted any interest in said lots. Indeed, the subsequent conduct of all parties in interest seems to indicate that said subleases were intended to operate as assignments, with assessment on said lots of their respective portions of the original ground rents.

The origin of the original $132 rent was as follows:

John Eager Howard, in the year 1808, leased to Charles L. Boehme, for the renewable term of 99 years, the lot at the southeast corner of Park Avenue and Mulberry Street, running easterly 90 feet on Mulberry Street to Monastery Alley, and southerly 48 feet on Park Avenue, reserving an annual rent of $132, payable September 1st.

The title to this rent, by mesne conveyances, is now in the Safe Deposit and Trust Company, as trustee under a deed dated January 11th, 1921, from Eleanor A. Chatard and others, devisees of George Hawkins Williams, who owned said rent at the time of his death.

The earlier history of the leasehold interest is succinctly set out in appellees' brief as follows:

"In 1823, the larger portion of the entire 90-foot lot, viz, the 75 feet on the west or Park Avenue side, was assigned subject to a rent of $106.50. This left 15 feet on Mulberry Street, which in 1852 was assigned by Boehm (the original lessee) to Carter, subject to a rent of $25.50 (the residue of the $132 rent left after apportioning the $106.50 to the 75 feet).

"Meanwhile the 75 feet had been in turn subdivided, the corner property being left with a rent of $62 and the residue of the $106.50, to wit, $44.50, being placed upon a lot in the interior and adjoining on the west the above mentioned 15-foot lot. This interior lot likewise reached Darius Carter by mesne conveyance, so that the situation in the early fifties was this:

"The original 90-foot lot, carrying an original rent of $132, had been subdivided by the leasehold owners into three parcels, consisting of:

"1.   The corner of Mulberry and Park Avenue, 31 feet wide, carrying a rent of $62.

"2.   The 44½ feet on Mulberry Street, beginning 31 feet east of Park Avenue, carrying a rent of $44.50.

"3.   The 15-foot lot on the extreme east, carrying a rent of $25.50.

"Up to this time, there had been merely 'apportionments' of the original rent in this way, but no sub-leases."

The later history of the part of the lot covered by the $70 rent ($44.50 and $25.50) has been hereinbefore set out.

It appears from the testimony of Mr. Ferdinand C. Dugan that his father, Cumberland Dugan, about 1882, persuaded Mr. George Hawkins Williams to purchase the ground rent of $132, and the witness examined the title for Mr. Williams; that witness "was always of the opinion it was two $70 ground rents but when I came to examine the title I came to find it was $132, $70 of which was paid by our end." As a lawyer, witness assumed there had been a division. "Q. Of course, during the period Mr. Darrell described from 1896, you are familiar with it? A. Yes, sir. Q. You heard this statement that the only rent that was paid to him was $70? A. Yes, sir. Q. Does that correspond with your own recollection? A. Yes, sir; in fact we have looked up my father's books to find any other rent and we have not been able to discover any rent. Q. Did you ever hear of any other rent than $70 being asked or paid? A. I surely have not. We tried to find—we looked up the estate of Mr. Durius Carter, who has been dead a number of years and we are trying to find where he was, but we were unable to find any trace of it. We were never given any bills from Durius Carter and he is the person who would be entitled to the rent exceeding $44.50 and $25.50. He was really paying on this part of the original rent. Q. I want to ask you one other question. Was that $70 paid as one rent or two rents of $25.50 and $44.50? A. It has always been one rent of $70. It is paid on the first of September."

H. Cavendish Darrell testified that he was a real estate broker and for many years had represented various properties of the George Hawkins Williams family. "Q. Since 1896? A. Yes, sir. Q. Before that time your father represented them? A. Yes, sir. Q. Have you as representative

of any branch of that family ever had anything to do with ground rent of $132 on the southeast corner of Park Avenue? A. That was always collected as two rents. It belonged to the estate of George Hawkins Williams. That estate was divided and this rent was distributed to Mrs. Smith, I believe. I don't remember which one of the daughters got it, but in my entire experience with the thing since 1896 it was always collected as two rents. Q. It wasn't one rent of $132; that was one rent of $70—that was east or west? A. The $70 property was the part Mr. Fitzberger had the house on. Q. The western part was $70? A. On the corner there was a saloon, and I collected in that way the different items from the different people for a great many years. Q. Were you the only one in charge of the collection of that rent before the Safe Deposit and Trust Company took charge of it? A. Yes, sir. Q. You don't know whether that was different before 1896 or merely you have no recollection? A. I know from the boooks of the business it was collected as two rents. Q. Have you the books? A. No, sir, they were destroyed in the fire, but it is a fact they were two rents before that."

Thus it is established definitely that for more than twenty-five years the present owners of the $132 ground rent have collected it in two parts, from separate owners, and have never undertaken to collect more than $70 from the several owners of the leasehold property in question. Mr. Ferdinand C. Dugan has a very firm and well settled conviction, from his association with his father's business and from an examination of his books, that for many years back of that time, in fact during the entire ownership of his father, no greater rent was collected.

In these circumstances we can have no reasonable doubt that there has been such an implied assent by the present owner of the $132 ground rent and its predecessors as to estop it, or any future owner of said ground rent, to question the apportionment. The case of *Connaughton* v. *Bernard,* 84 Md. 577, is conclusive of this question. See also *Barnitz* v. *Redington,* 80 Md. 622; *Jones* v. *Rose,* 96 Md. 483.

The case of *Smith* v. *Heldman,* 93 Md. 343, is in no way in conflict with the earlier decisions above cited. In the latter case JUDGE SCHMUCKER distinguishes between cases where the whole rent is collected from the owner of a building on part of the leased premises by direction of the others, and cases like those in *Connaughton* v. *Bernard,* and *Barnitz* v. *Redington, supra,* where the rent is collected in parts.

The point is made by appellants that the Safe Deposit and Trust Company of Baltimore, Trustee, the owner of said orginal rent of $132 is not, as such trustee and owner, a party to these procedings on the question of the apportionment *vel non* of said rent, and has not had its day in court. For the purpose of determining the marketability of the title it is not necessary that the owner of said rent should be a party to the proceedings. *Connaughton* v. *Bernard, supra.* The fact, however, that said company in another capacity is one of the appellees in this case, insisting that there has been an apportionment, even though not appearing here as trustee and owner of the ground rent, is a strong additional circumstance going to show that there has been an apportionment. We hold that the title is marketable, and will affirm the order appealed from.

*Order affirmed, with costs to appellees.*