698 A.2d 1106

Joseph N. SCHALLER, Trustee et al.

v.

CASTLE DEVELOPMENT CORPORATION et al.

No. 102, Sept. Term, 1996.

Court of Appeals of Maryland.

Aug. 27, 1997.

Stephen J. Hughes (J. Preston Turner, Treanor, Pope & Hughes, on brief), Towson, for Petitioners.

Walter C. Martz, II (Martz & Martz, P.A.; William R. Nicklas, Jr., Doherty, Nicklas & Prete, P.A., on brief), Frederick, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

RODOWSKY, Judge.

Former Maryland Rule of Procedure, Rule W72.d, relating to the foreclosure of mortgages, provided:

"A foreclosure action shall not be docketed, unless, at the time of docketing, there has been filed under oath by the mortgagee, his agent or attorney, a statement of the mort-

gage debt remaining due and payable, or a certificate that, as of the time of docketing, a statement has been served upon the owner of the equity of redemption. If the statement of mortgage debt is not filed, the mortgagee shall, upon written request immediately furnish a copy of the statement of the mortgage debt to any other holder of a lien on the mortgaged property." [1]

In the foreclosure case now before us a first mortgage lender filed a statement of mortgage debt on docketing, but, months after the sale had been ratified, increased it tenfold. If effectively amended, the statement of mortgage debt obliterated a surplus that would have been distributed to junior lienors. We must decide the consequences of the lender's noncompliance with the requirement for filing an accurate statement of the mortgage debt upon docketing a foreclosure.

The petitioners, Joseph N. Schaller et al., are substitute trustees acting for the benefit of the Bank of Baltimore (the Bank) under a deed of trust dated April 28, 1989, and recorded May 3, 1989, from Castle Development Corporation (Castle) covering certain realty in Frederick County, Maryland. This deed of trust secured a revolving line of credit of up to $600,000. Castle, and related companies, were engaged in homebuilding in Frederick County, Maryland and in the Winchester, Virginia area, and the Bank made a number of mortgage loans to Castle entities, some of which were secured by realty in Virginia and others of which were secured by realty in Frederick County, Maryland.

On December 22, 1992, Castle, its related companies, and their individual guarantors agreed with the Bank to modify and extend the various loans, including that secured by the deed of trust of April 28, 1989 (the Loan). Their agreement, as described in the Loan modification recorded January 1, 1993, contained cross-collateralization and cross-default provisions

---

1. Under the revision of the Special Proceedings Rules effective January 1, 1997, Rule 14–204 is the comparable rule to former Rule W72.

"so that a default under the Loan or any of the Cross–Collateralized Loans would constitute a default under the Loan as well as all of the Cross–Collateralized Loans and further that a default under the Loan or any of the Cross–Collateralized Loans would entitle the [Bank] to exercise its remedies against the collateral securing the Loan as well as the collateral securing the Cross–Collateralized Loans."

The borrowers defaulted, and the Bank instituted a number of foreclosure proceedings in Frederick County, Maryland and in Virginia. Our concern on this appeal is with the foreclosure of the Loan deed of trust, instituted as Civil No. 93–1044 in the Circuit Court for Frederick County on June 24, 1993. The statement of indebtedness filed on that date represented the outstanding principal balance to be $38,980 which, with interest and late fees, totaled $39,479.85 as of March 3, 1993. Per diem interest was $8.12. It appears that this statement of mortgage debt reflected the amount carried on the books of the Bank as the balance outstanding on the Loan as it had initially been made. The statement did not give effect to the cross-collateralization and cross-default provisions of the modification agreement. The Bank asserts that the total outstanding indebtedness owed by all Castle entities as a result of acceleration on default exceeded $6 million.

At the time of foreclosure the Loan deed of trust encumbered only two homesites, Lots 460 and 209 in Mount Airy. The former, in the Audubon Terrace North subdivision, was improved by a substantially completed two-story, cedar-sided dwelling containing three bedrooms and two and one-half baths. Lot 209, in the Eaglehead Summerfield subdivision, was improved by a completed two-story, vinyl-sided, colonial-style dwelling containing four bedrooms and two and one-half baths. At the sale held on July 12, 1993, Lot 209 brought $185,000 and Lot 460 brought $130,000. An attorney for one of Castle's subcontractor/material supplier creditors attended the sale but did not participate, inasmuch as the sale produced a surplus well in excess of the mortgage debt set forth on the statement filed by the Bank.

The sale of Lot 209 was ratified in September 1993 and the sale of Lot 460 was ratified in April 1994. Lienors, or purported lienors, on the two properties whose liens were junior to the Bank's cross-collateralized lien filed claims against the surplus in the foreclosure proceeding. The largest of these claims, $158,557.35, sought by an excavating contractor, Shook Excavating & Hauling, Inc., was disallowed in the audit on the ground that that claimant's judgment was not obtained until after the foreclosure sale had taken place. That claimant, however, successfully excepted to the auditor's report and obtained a remand by the circuit court to the auditor for consideration of that claimant's contention that it had perfected a lien prior to the sale by a prejudgment attachment. That issue is not before us, and the record does not reflect whether or how it was resolved. In a report filed July 28, 1994, the auditor recommended disbursement to the Bank based on its original statement of mortgage debt reflecting unpaid principal of $38,980, full payment to junior lienors whose claims were allowed, and a balance in the hands of the trustees in excess of $190,000, subject to order of the court.

On July 27, 1994, the Bank had filed an "Amended Statement of Indebtedness" that referred to the cross-collateralization feature of the Loan and claimed the outstanding principal balance to be $400,000. Based on the amended statement of mortgage debt, the auditor immediately filed an amended account that reported a deficiency of over $95,000 to the Bank. The junior lienors excepted to the auditor's report.

At the hearing on the exceptions no testimony was taken, and a few undisputed exhibits were introduced. The argument focused on concepts of estoppel and laches. The junior lienors in essence argued that they had been induced by the original statement of mortgage debt to take no action to protect their interests, inasmuch as it appeared that, because there would be a surplus, they need only file claims and await a distribution in full satisfaction of their claims. They argued that they might have bought in the property, or challenged ratification of the sale, or sought a marshaling of assets. The Bank argued that there was no evidence of prejudice to the

junior lienors, submitting that, if the mortgage debt had been correctly stated when foreclosure of the Loan commenced, the junior lienors would have to have paid in excess of $400,000 in order to acquire the properties and then would have to resell the properties at a still higher price in order to obtain any payment on their liens. The Bank urged the circuit court to find, based on the economics of the circumstances, that the junior lienors would not have acted differently than they in fact acted if the amount of debt on the amended statement had been the amount originally filed.[2]

In a written opinion the circuit court initially addressed whether amendment was permitted, concluded that any right to amendment was not unfettered, and then addressed whether permitting amendment would be equitable. The circuit court reasoned that the junior lienors had been prejudiced by the amendment inasmuch "as they were denied *the opportunity* to even consider whether to attempt to cover their liens." (Emphasis added). Even if the representation in the statement of mortgage debt was not intended to deceive, the junior lienors, said the court, had relied on it to their detriment. Under principles of estoppel or laches, the court held that it would be inequitable for the Bank to assert its rights. Consequently, the court directed that the original statement of mortgage debt be used in preparation of the auditor's report.

---

2. The $400,000 of principal indebtedness stated in the amended statement is a round figure selected simply to eliminate any surplus and without concern for a deficiency judgment. The Bank represents that the total proceeds from all of the foreclosure sales were under $4 million, resulting in an overall deficiency in excess of $2 million. These figures, however, include the deficiency on loans that were assigned to a third party just prior to the foreclosure sales. Although the Bank maintains that it owns any claim to a deficiency under the loans assigned to the third party, for purposes of arguing the instant matter the Bank limits its justification of the $400,000 amended statement of mortgage debt to the deficiency resulting from the foreclosures of the Virginia properties. The Virginia loans were not sold. The equivalent of audit reports from the Virginia foreclosures are exhibits in the instant matter, and they support the Bank's position that the deficiency on the Virginia sales was $453,669.84.

The Court of Special Appeals affirmed, essentially adopting the circuit court's analysis. *Schaller v. Castle Dev. Corp.*, 111 Md.App. 40, 680 A.2d 528 (1996). We granted the Bank's petition for certiorari.

The problem presented by the instant matter is determining the consequences of the Bank's failure to comply with former Rule W72.d. Where, as here, the consequences of noncompliance are not prescribed by the rule, or by a statute, a court "may determine the consequences of the noncompliance in light of the totality of the circumstances and the purpose of the rule." Maryland Rule 1–201(a). We turn first to the history of Rule W72.d in order to discern its purpose.

I

Provision for a statement of mortgage debt can be traced to Chapter 181 of the Acts of 1833. The statute, originally applicable only in Baltimore City, authorized foreclosure by assent to a decree.[3] Under the 1833 statute the affidavit was to be filed after the decree for sale but before the sale was made. *See Hays v. Dorsey,* 5 Md. 99, 101–02 (1853). Failure to file the statement of mortgage debt was not a ground for voiding a sale that had been ratified. *See Connaughton v. Bernard,* 84 Md. 577, 594, 36 A. 265, 268 (1897). If the omission of the affidavit were raised prior to the ratification of the sale, however, the sale could be set aside at the instance of the purchaser, even if the mortgagor consented to the earlier omission. *See Gatchell v. Presstman,* 5 Md. 161, 163–64 (1853).

---

3. In relevant part Chapter 181 of the Acts of 1833 provided:
   "That the said Trustee ... may after the arrival of the period limited by the said decree for the said sale, sell agreeably to the terms of said decree, the said mortgaged property ... the mortgagees ... before such sale, and after the arrival of the period aforesaid verifying by their oath ... a statement of the amount of said mortgage claim remaining due, and filing such statement in the court ... and such sales and the conveyances thereupon shall have the same effect, if finally ratified by the court ... as if the same had been made under decrees between the proper parties in relation to the mortgages, and in the usual course of the said courts."

Cases also arose under the 1833 statute in which the mortgagor sought to disrupt the foreclosure by arguing that the statement of mortgage debt that had been filed overstated the amount owed. In *Schaefer v. Amicable Permanent Land & Loan Co.*, 47 Md. 126 (1877), this Court refused to arrest a foreclosure sale on that ground, saying: "The account filed by the mortgagee, purporting to show the sum due, is not conclusive upon the mortgagor, and in case the property should be sold, it will be open to her to contest it...." *Id.* at 128. *See also Maryland Permanent Land & Bldg. Soc'y v. Smith*, 41 Md. 516, 522 (1875) ("If the statement is erroneous in not showing the true balance due upon the mortgage, it is open to correction, when the account may be stated by the auditor; but furnishes no reason for setting aside the sale."); *Pacific Mortgage & Inv. Group, Ltd. v. LaGuerre*, 81 Md.App. 28, 566 A.2d 780 (1989) (error for circuit court to enjoin foreclosure by finding overstatement of interest due in statement of mortgage debt; amount of interest for determination on audit); H. Ginsberg & I. Ginsberg, *Mortgages & Other Liens in Maryland* 400 (1936).

The requirement that the statement of mortgage debt be filed when the foreclosure action was instituted (as contrasted with filing anytime prior to sale) was introduced by the original Special Proceedings Rules adopted on July 17, 1958, and effective January 1, 1959. Former Rule 1391c.3(c) provided:

"A foreclosure action shall not be docketed unless, at the time of docketing, there has been filed under oath by the mortgagee, his agent or attorney, a statement of the amount of the mortgage debt remaining due and payable. The failure to file such a statement, however, shall not in itself invalidate a foreclosure sale." [4]

---

4. The last sentence of former Rule 1391c.3(c) later became Maryland Rule W72.f. ("The jurisdiction of the court over the mortgaged property shall attach upon the docketing of an action ... with or without the statement or certificate required by [Rule W72.d]."). The provision is now Maryland Rule 14–203(c).

The proposed original Special Proceedings Rules were published for comment. *See* Tentative Draft, Maryland Rules of Procedure, Chapters 1000 through 1300 (Sept.1957).[5] The tentative draft presented proposed Rule 1391c.3(c) basically in the form in which it was adopted.[6] One comment received by the Rules Committee suggested that the statement of mortgage debt be filed before sale, together with the bond, so that the mortgagee could compute interest to the day of sale and also include liens and charges revealed by record searches and by information received. A Rules Committee subcommittee dealing with the mortgage foreclosure rules recommended that the proposed rule not be changed, saying:

> "The Rules Committee decided to change the existing law and require the filing of the statement upon docketing of the case to enable the mortgagor to determine the exact amount claimed. Insofar as items arising after the filing of the statement are concerned, the mortgagee can, of course, file a supplemental statement. The interest to the day of sale can be computed by the auditor. Liens claimed by third parties, such as tax claims, are not part of the mortgage debt properly speaking and should not be included in the statement. Parties claiming such liens can file separate petitions in the foreclosure suit."

Undated memorandum on file in the Rules Committee offices and headed, "COMMENTS AND SUGGESTIONS RE RULES 1391–1395: FORECLOSURE OF MORTGAGES AND OTHER SECURITY DEVICES WHICH MAY BE FORECLOSED BY JUDICIAL PROCEEDINGS," at 1. Although a publicly filed statement of mortgage debt would be available to all interested persons, it appears that the primary concern underlying the requirement was to advise the mortgagor at filing of the exact amount of the mortgage indebted-

---

**5.** This publication was a seventy-nine page, paper covered volume, the cover of which was grey in color. It was known as the "Gray Book" in tribute to Honorable John B. Gray, Jr., the then Chairman of the Rules Committee.

**6.** On adoption the words, "and payable," were added after "due."

ness. This would facilitate any possible refinancing, give the opportunity to the mortgagor to stimulate the interest of others in buying the property, and warn the mortgagor of the possible magnitude of a deficiency judgment.

This Court on September 15, 1961, adopted the Twentieth Report of the Rules Committee, renumbering and revising the Special Proceedings Rules effective January 1, 1962. Former Rule 1391c.3(c) became Rule W72.c.3. The rule was also modified to permit, as an alternative to filing the statement of mortgage debt in the court records, sending the statement to the mortgagor and certifying in the court records that the statement had been served. As a companion to that change, the rule required furnishing the statement of the mortgage debt, if not filed in court, to a lienholder.[7] Former Rule W72.c.3 was renumbered and restyled as Rule W72.d by order of this Court of June 16, 1975, effective July 1, 1975.[8] The version of the rule, as amended effective July 1, 1975, is the version in effect at the time of the proceedings in the case before us, and its text appears at the introduction of this opinion.

The provisions in the amended rule addressing lienholders seem primarily intended to make available to lienholders the same information which they could have gotten from the public record prior to the creation of the option whereby the mortgage lender need not file a statement of mortgage debt in

---

7. Former Rule W72.c.3, effective January 1, 1962, read as follows:

"A foreclosure action shall not be docketed, unless, at the time of docketing, there has been filed under oath by the mortgagee, his agent or attorney, a statement of the mortgage debt remaining due and payable, or a certificate that such a statement as of the time of docketing has been served upon the owner of the equity of redemption. The failure to file such a statement or certificate, however, at the time of docketing, shall not in itself invalidate a foreclosure sale; but no sale shall be ratified until the statement is filed in the proceedings. Upon request, in writing, the mortgagee shall also immediately furnish such statement of the mortgage debt, if not filed in court, to any other holder of a lien on the mortgaged property." 9B Maryland Code (1957, 1963 Repl.Vol.), Rule W72.c.3.

8. The provision that failure to file a statement of mortgage debt was not jurisdictional was at that time transferred to Rule W72.f.

the court records. Lienholders' interests in the exact mortgage debt seemingly include preparation of a possible bid and stimulation of interest in the sale. Phrased another way, the interest of junior lienors in an accurate statement of the mortgage debt is not limited to a possible challenge of the amount of the mortgage debt at the time of the audit.

## II

■ A further component in determining the appropriate consequences under Rule 1–201(a) for a violation of a rule of procedure is the resulting prejudice. The nature and degree of the prejudice is closely related to the purpose of the requirement. For example, in *Gaetano v. Calvert County*, 310 Md. 121, 527 A.2d 46 (1987), we held that a circuit court had abused its discretion by dismissing an administrative appeal because the appellant failed to file a memorandum within the time required by former Rule B12. The purpose of the rule was to furnish the adversary adequate time to prepare, but the circuit court had dismissed even though "the appellants' late filing of their memorandum did not undermine [the] purpose [of the rule] one whit." *Id.* at 126, 527 A.2d at 48. *See also Department of Econ. & Employment Dev. v. Hager*, 96 Md.App. 362, 374–76, 625 A.2d 342, 348–49 (1993) (holding that circuit court did not abuse its discretion in denying appellant's motion for default and motion to strike appellee's untimely filed memorandum because appellant was not prejudiced by the late filing). *In re Keith G.*, 325 Md. 538, 601 A.2d 1107 (1992), and *In re Keith W.*, 310 Md. 99, 527 A.2d 35 (1987), each considered whether juvenile petitions should be dismissed as a consequence of the failure by the State to comply with time limits prescribed by rule or statute. Although the immediate purpose of the requirements that were violated was arguably to benefit the juvenile, dismissal of the petitions was inconsistent with the overall purpose of the juvenile statutes that are designed to provide treatment and rehabilitation. *In re Keith G.*, 325 Md. at 544, 601 A.2d at 1110; *In re Keith W.*, 310 Md. at 106, 527 A.2d at 38.

More analogous to the problem presented here is *Hood v. State*, 334 Md. 52, 637 A.2d 1208 (1994). There, in the middle of a jury trial in a prosecution for first degree murder, the presiding circuit judge became ill. A second judge was substituted who presided to the conclusion, a conviction. Maryland Rule 4–361(b) permits substitution of trial judges but requires the substitute judge to certify "that he or she has become familiar with the record of the trial." In *Hood* the substitute judge did not make the certification, although that judge mentioned on the record that there had been a discussion concerning the case with the judge who previously had presided. We held that gaining familiarity with the record ordinarily would require the substitute judge "to read, or to have read to him or her, a written transcript of the previous proceedings, or in the case of an audio or video record, to listen to the prior proceedings." *Hood*, 334 Md. at 58, 637 A.2d at 1211 (footnote omitted). Although it was clear that that had not been done, the question of whether any prejudice resulted to the convicted defendant was not so clear. We recognized that, although the defendant had been deprived of the right to a substitute judge who was familiar with the record, "it may be very difficult for a defendant to demonstrate prejudice." *Id.* at 62, 637 A.2d at 1213. Under those circumstances we held that there is a presumption of prejudice and that the burden is on the State to rebut that presumption. *Id.* In a criminal case, the burden on the State is to demonstrate beyond a reasonable doubt that the error was harmless, *id.*, a burden that we held the State had not met in *Hood*.

■ A similar approach should be applied in determining the consequences of the violation of former Rule W72.d in the instant matter. Here, the Bank did not undertake to reflect more accurately in the statement of mortgage debt the actual amount secured by the Loan deed of trust until after the sale had been conducted, the sale had been ratified, and that judgment of ratification had become final and unappealable. Consequently, to determine whether there was prejudice to the junior lienors requires attempting to reconstruct what would have happened had the statement of mortgage debt

reflected an outstanding principal balance of $400,000.[9] Under these circumstances, it is appropriate for the party whose rule violation created the problem to bear the burden of demonstrating that no prejudice resulted from the rule violation.

### III

In the instant matter the circuit court essentially applied a rule of *per se* prejudice to the junior lienors. In concluding that they were prejudiced, based on the deprivation of an "opportunity" to bid at the foreclosure sale, the circuit court applied a rule that prohibits the increase of the stated principal balance in all cases at a time when it is too late to reschedule the sale of, or to resell, the property. There does not seem to be a need for so stringent a prohibition against upwards amendment of the principal balance. First, such a prohibition operates much like a forfeiture on the facts before us. Here, the Bank has the first lien and is owed a principal balance of at least $400,000 that is secured by that first lien. Prohibiting recognition of the actual mortgage debt gives liens that are junior to the first lien a priority over the first lien as to all net-of-costs sales proceeds that are not applied to satisfy an unpaid principal balance of $38,980, with interest and late charges on that amount. We should not confuse assuaging disappointed expectations with vindicating legal rights. Second, ordinarily there is no advantage to be gained by a lender in deliberately understating the amount of mortgage debt at the time foreclosure is instituted, so that there is no need for a strict deterrent. In the rare case in which a lender deliberately seeks an improper advantage by understating the mortgage debt, the rule that we have adopted, by requiring the foreclosing lender to prove that the party objecting to the

---

9. Of course, if the total obligation of all Castle entities that was secured by the Loan deed of trust under the cross-collateralization effected by the modification agreement had been used in the statement of mortgage debt initially filed, that statement could have been in excess of $6 million. We use $400,000 for purposes of the analysis to be performed in this case because that is what the Bank claimed when it amended.

increase has not been prejudiced, should accommodate a just resolution of the controversy.

Accordingly, we shall direct that this case be remanded to the circuit court for a factual determination as to whether the Bank met its burden of proving that there was no prejudice in fact to the junior lienors. In that connection the circuit court may, in its discretion, permit the introduction of additional evidence by any party.

■ The Bank urges this Court to rule as a matter of law that there is no prejudice. The argument asks us to conclude that the foreclosure sale price could never have exceeded the total of the costs of sale, a principal mortgage balance of $400,000, and interest and late fees on that principal balance. The Bank bases this argument on apparent arms-length contracts of sale for the two lots that Castle had entered into prior to the foreclosure. A purchaser had contracted to buy Lot 209 for $195,000, and that same person bought in the same property at foreclosure for $185,000. A purchaser had contracted to pay $157,900 for Lot 460 with a fully completed dwelling, and that property sold at foreclosure in a substantially completed state at $130,000. It is not, however, the appellate function to make first level factual determinations concerning market value where the inferences are debated and debatable.

A further factual complication is that the junior lienors have argued this case as if all of their claims were those of one party whose single claim enjoyed a second priority. Actually, the allowed claims became liens on the Castle property at different times. Consequently, if the circuit court determines that the Bank has failed to prove that no claimant would have bought in the two lots for an amount in excess of $400,000, plus interest, late fees, and costs, then the court will have to determine whether the Bank has proven that the property would not resell at a profit sufficient to satisfy one or more or all of the junior lienors based on the priorities and amounts of their judgments, as set forth in the table below. (The table

reflects only the principal amounts of the liens, without interest.).

| CREDITOR | DATE | JUDGMENT AMOUNT | CUMULATIVE AMOUNT |
|---|---|---|---|
| Great Eastern Concrete, Inc.– Mechanic's lien | March 3, 1993 | $17,998.29 | $0 to $17,998.29 |
| Wickes Lumber Co. –Mechanic's lien | March 12, 1993 | $11,708.34 | $17,998.30 to $29,706.63 |
| Wetnight Electric, Inc.–Mechanic's lien [10] | March 26, 1993 | $1,428.00 | $29,706.64 to $31,134.63 |
| Walter W. King Plumbing & Heating Contractor, Inc. –Mechanic's lien | March 26, 1993 | $2,506.01 | $31,134.64 to $33,640.64 |
| Walter W. King Plumbing & Heating Contractor, Inc.– Judgment creditor | June 2, 1993 | $1,549.00 | $33,640.65 to $35,189.64 |
| Century Floors, Inc. –Judgment creditor | June 24, 1993 | $27,175.00 | $35,189.65 to $62,364.64 |

In addition, if the claim of Shook Excavating & Hauling, Inc. is allowed as a lien, the appropriate amount and priority of that lien would have to be considered in the prejudice determination.

■ The junior lienors assert that they were prejudiced because they could have required a marshaling of the Castle assets if they had been accurately advised, as required by Rule W72.d, of the mortgage debt. We do not think that marshaling could apply here. Chancellor Bland in *Watkins v. Worthington*, 2 Bland 509 (1830), gave two illustrations of situations in which equity would require marshaling. These were

"where a creditor has his debt secured by a lien or mortgage upon two funds, and another has an interest in only one of the funds, he may compel the one whose debt is secured by both, to resort to the other, so far as it may be necessary, to satisfy both claims. . . .

---

10. There is no legal significance intended in listing the Wetnight lien ahead of the King lien.

"And where there are two different sets of parties, and one set may resort to both funds, and the other only to one, the party who may have recourse to both, may be compelled to resort to the one fund, which cannot be reached by the other, so as to leave enough for both."

*Id.* at 532 (citations omitted). Here, even if we assume, *arguendo*, that the marshaling doctrine would treat Castle-related entities as the debtor of the junior lienors, the other funds, that is, the other foreclosure sales, produced deficiencies as to the Bank's respective claims. In any event, "the securities or assets can never be marshalled to the prejudice of the creditor; or so as to suspend or put in peril his claim; or upon any other terms than giving him entire satisfaction." *Id.* Here, the debt from Castle to the Bank, secured by the Loan deed of trust, was at least $400,000, but the junior lienors' "marshaling" argument would give the Bank less than the satisfaction to which it was entitled under its admitted first lien.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A MANDATE VACATING THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AND REMANDING THIS CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THE OPINION OF THIS COURT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.