36 A.3d 426

**Bonnie L. MADDOX**

v.

**Edward S. COHN, et al.**

**No. 55, Sept. Term, 2011.**

Court of Appeals of Maryland.

Jan. 24, 2012.

380

John B. Robins, IV (John B. Robins, IV, P.A., Salisbury, MD), on brief, for Petitioner.

Bizhan Beiramee (Bizhan Beiramee, Esq., P.C., McLean, VA), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and DALE R. CATHELL (Retired, specially assigned), JJ.

DALE R. CATHELL, J. (Retired, specially assigned).

This case arises out of a mortgage foreclosure proceeding involving a residential home in Wicomico County. In the advertisement for the sale, the trustees included an additional condition not found in the mortgage documents or authorized by the Maryland Rules that any successful purchaser at the sale would be required to pay the legal fees of attorneys who would be utilized to review the documents on behalf of the trustees by which they would hold settlement and ultimately convey title. This additional charge would not be included as a cost in the foreclosure proceeding and would not normally be subject to court review or audit. It was argued, without contest by the trustees, appellees here, that such practice has become common throughout the state by one or more law firms that specialize in foreclosure practice.[1] At the sale *sub*

---

[1]. This record is mostly silent as to why attempts are being made to impose these legal fees external to the regular foreclosure procedure. It may well be that it has become a practice generated by the fact that in the current economic and housing crisis, the amounts bid in residential foreclosures, especially with respect to sub-prime loans, rarely produce sufficient funds to satisfy the amount of the mortgage debt and foreclosure costs, and thus, these types of lenders have to resort to their own funds to pay for legal services. If this practice, supported by the appellees, were to be upheld, the trustees, normally designated by the lender, will have shifted the legal fees that would otherwise have to be paid by the lenders (the trustees have no independent source of funds except those received during the foreclosure and in deficiency cases there are no available funds) to the successful bidders.

While these unilateral-mandatorily-imposed fees may be considered modest in individual cases, when generated in large numbers by law

*judice*, the property was acquired by the lender or its representatives and, thus the fee called for in the advertisement was unlikely to have been paid even if it had been due.

The homeowner opposed the ratification of the sale by excepting to the Report of Sale on the ground that the imposition of a fee not provided for by the Maryland Rules or local rule and not subject to audit was improper and caused the sale not to be "fairly and properly" made.

The trial court found in relevant part that "the imposition of the fee to review the very documents that has been charged by the Court to convey at a public sale, a fee outside of those approved by the Court for identical work required by the appointment of the Court, would be improper." Nonetheless, the trial court found that the imposition of the fee did not make the sale unfair or improper and ratified the sale.[2] Upon motion, the trial court ordered a stay of the Order of Ratification pending appeal.

An appeal was taken to the Court of Special Appeals. That court, in a reported opinion, affirmed the position taken by the trial judge, *Maddox v. Cohn*, 199 Md.App. 63, 20 A.3d 153 (2011). It summarized its holding as follows:

> "In this case, we have been asked to invalidate what appears to be a routine practice in some parts of Maryland of requiring a successful third-party bidder at a foreclosure sale to pay the trustees, who have been compensated by the court, an additional fee of $295 as an attorney's fee for review of settlement documents. *We agree with the Circuit Court ... that the imposition of the fee is improper because there is no explicit provision in the statute, Maryland Rule, local rule, or in the debt instrument itself authorizing this charge.* [Emphasis added.] Although we find that such a

---

firms or other entities with a volume practice, they may constitute much larger sums in the aggregate.

2. We have been informed by the appellant, without opposition by appellees, that another trial judge in the same jurisdiction has ruled to the contrary, refusing to ratify foreclosure sales in which such additional fees are demanded.

fee would have been improper had it been imposed, it was not charged in this case.[3] Thus, we still affirm the court's ratification of the sale and conclude that appellant had no standing to raise the fee question."

199 Md.App. at 67, 20 A.3d at 155

After the opinion of the Court of Special Appeals was filed, appellant filed a Petition for Certiorari with this Court. The issue presented in this petition was framed as follows:

"2.  The case presents questions which have not heretofore been addressed by the Court of Appeals in cases involving foreclosures.  And, in the wake of the reported opinion of the Court of Special Appeals, and even more compelling question is presented with respect to an inconsistent burden of proof in cases of noncompliance with applicable rules versus imposition of fees or requirements not authorized by the rules and which are "improper."

The questions arising out of that issue were stated in the petition as follows:

"a.  May a substitute trustee under a Deed of Trust filed for foreclosure, without court approval, authorization or scrutiny, unilaterally require that, in order to bid on property at the sale, the successful bidder agree to pay to the Substitute Trustee's attorney, i.e. the Trustee or the Trus-

---

3.  Putting aside that it is highly unlikely that the Trustees would collect such a fee from the lender who appointed them and who became the successful bidder at the sale, it could not yet have been imposed or collected.  It was a legal fee that, even if valid, would not have been due until the documents of settlement and conveyance were required. That would only be after the sale was ratified.  In this case an appeal was taken from the Order of Ratification and the trial court stayed the Order of Ratification pending the appeal.  Accordingly, the Court of Special Appeals' position that the mortgagee lacks standing to appeal based upon the fact that the fee was not charged is incorrect.  The time for the imposition of the fee had not yet occurred.  More important, the key issue is whether in arbitrarily requiring the fee, the trustees were taking an action that would generate the highest price for the property. Not even a stretch of logic can support a position that by requiring a buyer to pay other sums outside of the foreclosure process, the trustees were taking an action designed to maximize the sums bid at such a sale.

tee's law firm, a stipulated fee ostensibly for review of the settlement documents?

b. Can a foreclosure sale be "properly made" if the Substitute Trustee imposes an improper condition on the successful bidder, i.e., the payment of a fee to the Trustee's attorney, which is not authorized by the Maryland Rules of Procedure or the debt instrument?

c. If a foreclosure sale is not "properly made" because of the imposition by the Substitute Trustee of an improper condition on the successful bidder, is the burden of proof on the Defendant/Mortgagor to prove the prospective bidders were discouraged from attending the sale in order to establish that the sale was not "fairly and properly" made?

d. Is the burden of proof different when the Substitute Trustee fails to comply with the rules of procedure governing foreclosure sales as opposed to when he/she imposes requirements or conditions which are not authorized by the rules and which are improper?"

We granted the Petition for Writ of Certiorari in respect to all the questions presented. *Maddox v. Cohn*, 421 Md. 192, 25 A.3d 1025 (2011). Because we answer questions a and b above in the negative and reverse on that basis, it will not be necessary to directly address questions c and d.

## Discussion

### Policy Issues

In *Simard v. White*, 383 Md. 257, 859 A.2d 168 (2004), we tracked the evolution of mortgages from ancient days to the present, from the era of strict mortgages to the present time with its host of protections for mortgagors. While we found that the specific common law issue raised by the parties in *Simard* did not actually exist, *id.* at 307, 859 A.2d at 197–198, we identified the question presented as "Whether parties to a power of sale foreclosure may 'contract out' the common law rule that the defaulting purchaser is entitled to any surplus proceeds of resale by placing such a provision in the advertisement of sale?" *Id.* at 262, 859 A.2d at 171. In the present

case, the position of the appellees appears similar in that they have created an extra condition, i.e., the requirement that the purchaser at a foreclosure sale must pay additional legal fees incurred by the trustees for which the trustees are already being compensated consistent with the rules applicable to foreclosure sales. Appellees are attempting to 'contract out' a requirement not contemplated by the rules or statutes. Appellees relied on the fact that the extra fee requirement was advertised as providing authority for the trustees' exercise of discretion in demanding the fee.

We noted in *Simard, supra,* that:

" 'Courts of equity in England recognized and enforced these powers. The great objection to them was that they committed a power to the mortgagee which was not compatible with his relation to the mortgagor. He was practically a trustee to sell for the benefit of himself and the mortgagor; but his interests were not identical with those of the mortgagor, and he was subjected to temptation to abuse the position of trust which he occupied by not exerting himself to sell to the best advantage....

.... Acts were passed to regulate the exercise of the power and prevent its abuse. These acts clothed the mortgagee with the responsibilities and duties of a trustee, and strictly directed the method of his procedure in exercising his power to sell....' " (Internal citations omitted.)

*Simard,* 383 Md. at 281–82, 859 A.2d at 182 (quoting from Richard M. Venable, *The Law of Real Property* 179), and its discussion of trustees' duties in a power of sale context.

We further commented in *Simard* at 312, 859 A.2d 168 on the duties of trustees conducting foreclosure sales:

" 'Trustees acting under a power of sale contained in a deed of trust have discretion to outline the manner and terms of sale, providing their actions are consistent with the deed of trust and the goal of securing the best obtainable price:

'While the discretion in the manner and terms of sale, lodged in the trustee under the terms of the deed of trust, is contractual, and gives a wider latitude to the trustee

than that ordinarily allowed trustees making sales under orders or decrees of the court, yet such discretion has never been held to be unlimited. When a sale is attacked, it must be shown that the trustee did not abuse the discretion reposed in him, and that the sale was made under such circumstances as may be fairly calculated to bring the best obtainable price. . . .' "

*Id.* at 312, 859 A.2d at 200–01 (quoting from *White v. Simard,* 152 Md.App. 229, at 241–42, 831 A.2d 517, at 524–25 (2003)).

In the present case, it is conceded that there was no provision in the mortgage documents between the mortgagor and mortgagee providing for the imposition of the legal fee at issue. Nor is such an added legal fee provided for in the Maryland Rules or in Maryland's statutes.

It is reasonable to presume that any purchaser willing to pay that added legal fee might also be willing to have added to his bid, if necessary, the amount of that fee.[4] In that event, the mortgagor would have received the benefit of the extra sum (in this case $295.00) either as part of a surplus or as a reduction in the deficiency for which the mortgagor might be liable. Instead, the imposition of the fee diverts a sum, however minimal it may be in some instances, from the sum that might be bid at the sale. It is much different than a trustee advertising the manner and terms of sale which generally include the date, time, place and manner of sale (public auction, written bids, etc), how to qualify as a bidder, i.e. deposit requirements, the way in which the purchaser will be required to pay the purchase price itself (so much on the date of sale, additional payments upon reaching certain stages in the foreclosure process), the pro-ration of taxes, title issues and the like.

Since our opinion in *Simard* and the beginning of the contemporary foreclosure crisis, the Legislature has enacted several new statutes, or amended statutes, to further protect

---

4. The fee added in this case, $295, might be characterized as minimal. But, under the theory of appellees, there is apparently no limit on the extent of the fee.

the interests of mortgagors relating to foreclosures, especially foreclosures of residential properties. Many of the statutory changes arose out of a task force created by the Governor— The Home Ownership Preservation Task Force. This Court has adopted, responsively, amendments to its rules relating to those statutes and foreclosure issues generally.

The newly enacted statutes include Chapters 5 and 6 of the Acts of 2008, now codified as Sections 7–301, 7–302, 7–310, 7–312 of the Real Property Article. Additionally, the Legislature, beginning in 2008 with Chapters 1 and 2 of the Acts of 2008 and continuing with Chapter 36, Section 6, and Chapters 149, 691 and 692 of the Acts of 2009, as well as Chapter 485 of the Acts of 2010, and Chapters 36, 37, 65, 245, 246, 355, 477, and 478 of the Acts of 2011, has created exhaustive and extensive processes, such as mediation, waiting periods and the like relating to additional duties that lenders have before or during the foreclosure process.[5] Generally, from 2008 forward, the respective bills were passed as emergency bills. As we view them, these new legislative acts are primarily designed to afford additional protections to mortgagors/homeowners by slowing down the foreclosure process to provide opportunities for homeowners to avoid foreclosure. They also provide requirements that lessen the impact of foreclosures on local governments.

Since the beginning of the modern foreclosure problems, and especially after the passage of these recent statutes, this Court has amended its rules to ensure that the Rules are compatible with the Acts.[6] These amendments include Md.

---

5. Earlier in 2005 the Legislature enacted the *PROTECTION OF HOMEOWNERS IN FORECLOSURE ACT*, that began the process of affording additional protection to mortgagors.

6. The annotations to the new amendments contains the following
   "**Emerging Issues Analysis**
   Jeffery B Fisher on Strategic Review of Maryland's New Rules of Practice and Procedure for Foreclosures of Interests in Real Property Effective May 1, 2009, the Maryland Court of Appeals adopted new rules of practice and procedure for foreclosures of interests in real property, repealing the former rules. The new rules contain many

Rule 14–201 (applicability), 14–204 (institution of actions), 14–205 (conditions precedent to filing), 14–207.1 (providing circuit courts with screening powers), 14–212 (mediation), 14–214 (sale), 14–215 (post-sale procedures), and 14–216 (proceeds). For the most part, these rules afforded additional protection for mortgagors involved in foreclosure actions.

Both the legislative acts and the amendments to the Rules were designed primarily to protect the interests of residential homeowners in the foreclosure process.[7] Additionally, certain of the Acts of 2009 were primarily to grant authority to local governments to enact ordinances requiring notice of foreclosures to the local governments in order to address some of the issues from the mortgage crisis that were impacting local governments.

## Legislative History

While certain amendments to some of the statutes relating to foreclosures occurred prior to 2007, (as an example see Chapter 509 of the Acts of 2005—*Protection of Homeowners in Foreclosure Act* ) we shall concentrate our review of the legislative history by beginning at an obvious point. In June of 2007, Governor O'Malley established *"The Maryland Home Ownership Preservation Task Force."* On November 29, 2007, the Task Force issued its report. In the cover letter to Governor O'Malley, the secretaries of the Task Force, Mr. Thomas E. Perez and Mr. Raymond A. Skinner, noted the purpose for which the Task Force had been formed:

"You charged the Task Force with developing an action plan to address escalating foreclosure rates and identify

procedural changes and, *even though the impetus for the changes came from legislation impacting foreclosures of residential property* [emphasis added], the new rules are applicable to all foreclosures, and any foreclosure practitioner must become familiar with them."

7. Mediation and other new requirements create additional costs. Although some of the charges for services now required by statute must be advanced by the mortgagees, they may ultimately be borne by the mortgagors as costs of foreclosure and be reflected in lesser surpluses or greater deficiencies.

effective ways to preserve home ownership for Marylanders....

The specific objectives of the Task Force were to:

. . .

Examine current laws and regulations in Maryland governing the mortgage industry and the foreclosure process and recommend changes, including legislative and regulatory actions where warranted; . . . ."

In the letter the Task Force noted:

"Maryland pays a substantial cost for rising foreclosure rates. Families lose their homes, are uprooted and their lives are disrupted. Their ability to obtain credit suffers and many families' chief asset, the equity in their homes, is lost. In addition, lenders lose money and employees in the mortgage industry are in danger of losing jobs as lenders reel from the weight of defaulting loans."

The report was divided into four sections with three separate work groups (many Task Force members served on more than one group). As to the subsequent change in policy, we are primarily concerned with the *Legal and Regulatory Reform Work Group* and its findings and recommendations. Some of its recommendations included:

"9.1: Adopt a statute that a lender or mortgage holder may not file an Order to Docket commencing a foreclosure action until 90 days from the borrower's default."

"9.2: Adopt a statute requiring the Notice of Intent to Foreclose be sent to the borrower by certified and first class mail 45 days prior to the filing of the Order to Docket in a foreclosure action and that the sending of the Notice be a prerequisite to filing any foreclosure action in Maryland."

"9.3: Require the Court to send a uniform Notice of Order to Docket to the borrower and to the address of the residential property in foreclosure and include in the notice the day certain after which the foreclosure sale may be held."

"9.4: Extend and codify the time before which a foreclosure sale may occur to require that a foreclosure sale may not occur until 45 days after the Order to Docket is filed."

In 2008 the Legislature passed and the Governor signed several Administration Bills relating to the Task Force's report. They became Chapters 1, 2, 3, 4, 5 & 6 of the Acts of 2008. All were passed as emergency bills. All related to the present mortgage crisis. In submitting the Bills to the Legislature, the Governor stated:

"The O'Malley Brown Administration intend that each of these initiatives will serve as a reminder for those in the mortgage industry that we will not stand by while Maryland's middle class families fall victim to irresponsible, deceptive and predatory lending practices. We are also hopeful that these initiatives will help preserve home ownership during a worsening foreclosure crisis in our State. At the end of the day, we are confident that these bills will . . . ensure that the foreclosure process is reasonable and fair to all parties involved, . . ."

Chapters 1 & 2 of the 2008 Acts related to the 90 day and 45 day limitations on the institution of foreclosure actions.[8] The bill file contains a supporting letter from the Office of Government Relations supporting the Bill.[9] After discussing the serious problems the mortgage crisis was causing Baltimore City, the letter noted the Task Force's Report and notes that the Bill is creating ". . . earlier and more extensive notification requirements to the property owner . . ." Other supporting

---

**8.** Prior to this time foreclosure actions could be filed (depending on advertising dates) as soon as 15 days after default. Thus, these Chapters of the 2008 Acts were intended to slow down the foreclosure process. Prior to these Acts the public policy had been to expedite the process, not delay it. See *Wells Fargo Home Mortgage, Inc. v. Neal,* 398 Md. 705, 726, 922 A.2d 538, *infra.*

**9.** Many of the letters contained in this Bill's file are also found in the other files of the related bills. We shall not repeat them unless necessary. We also shall not address the legislative history of all the bills. The purpose of them all is to protect homeowners. The theme is consistent throughout the various bill files.

letters in the Bill file, such as the one from the Lutheran Office on Public Policy in Maryland, reiterate that purpose of the Bill was to establish "a longer period for notification . . . in order to better equip consumers (homeowners) for the possibility of addressing their mortgage issues." In accord are letters from the University of Baltimore School of Law's Community Development Clinic, the Community Law Center: "In recent years, over 70% of sub-prime loans made in Maryland were brokered loans—not necessarily made by the lender. Tracking these loans has been enormously difficult, if not impossible." [10] The Floor Report, as relevant here, restates

---

**10.** Some experts perceive the sub-prime market, along with the creators of 'derivatives' (i.e. 'securitizations'), have caused some of the current economic problems. These types of lenders retain mortgage servicing companies to collect and supposedly track payments and initiate foreclosures. Many mostly local community banks did not 'bundle' mortgages, retained sound banking practices and also serviced their own loans. While these local banks may have also been hurt by the general malaise in the marketplace caused by others, they remain, generally, very viable institutions.

Very serious title issues are in the future, if not already appearing, as title and settlement attorneys seek to clear titles, and title insurance companies attempt to insure them, where these bundled mortgages appear in the chain of title (or worse, where they are not evident from the land records). In many instances, if not most instances, such attorneys may be unable to ascertain who then holds the mortgage as the mortgages and/or the instruments of indebtedness they secure have been bundled in groups of as many as a thousand mortgages or instruments attached to derivatives and traded like stocks. The transfers of derivatives from buyer to buyer is not recorded among the land records of the county where the land is situate, but, in "derivative" transfer ledgers somewhere on Wall Street or in some stock exchange somewhere. Many are allegedly tracked by an entity called the Mortgage Electronic Registration System (MERS) (see *Anderson v. Burson*, 424 Md. 232, 35 A.3d 452 (2011) relating primarily to the law of negotiable instruments), which operates completely outside the land records offices throughout the various states. Often MERS, or a counterpart, is named as a nominee for the actual lender in the original instrument but then the actual lender transfers the instrument. In other words the land document, the mortgage and/or lending instrument, is assigned (bought and sold) without there being any assignment of the instrument recorded in the land records.

Apparently, in many instances, even though the mortgage servicer allegedly can retrieve the appropriate document, or documents, by going through the Mortgage Electronic Registration System (MERS), or a counterpart, it is a somewhat time consuming process. This has led

the provisions of the Bill and notes that it results from the report of the Task Force.

In 2009 Bills were passed that attempted to better define the term "residential", (HB 798) and granted power to local governments to pass ordinances requiring that they receive notice of foreclosures in their jurisdictions (HB 640).

In 2010 Chapter 485 of the Acts of 2010 became law. In most instances it required that a mediation process be required before a lender could commence or continue with a foreclosure of residential property. The bill file for the relevant bills [11] contains very similar letters to those contained in the bill files for the relevant Acts of 2008 & 2009.

The Acts of 2011 include another provision designed to limit the practices of foreclosure mills. It concerns imposing additional requirements on persons attempting to use Lost Note Affidavits in lieu of the actual instruments of indebtedness. Apparently, as we have noted, in some instances it is alleged that the actual instruments have been lost in the shuffle, and mortgage services are attempting to foreclose without sufficiently trying to identify the current holder of the instrument or to retrieve the actual instrument through the use of MERS (see *Anderson, supra.*). The 2011 legislative provision limits somewhat their ability to do so.

It is clear that the legislative process relating to mortgage foreclosures of the last several years has been designed to slow down the mortgage foreclosure practices to limit the

---

to the practice of such mortgage servicers attempting to routinely initiate foreclosures via filing an Affidavit of Lost Instrument. The widespread use of such methods to initiate foreclosures raises serious perjury issues on the part of the persons making the affidavit. The instruments are not lost, they are somewhere in MERS system and, generally, the affiant is well aware that the mortgage or other instrument of indebtedness is not actually lost.

11.  In most instances there were companion bills filed in both houses of the Legislature. One or the other became law. When we talk about documents found in a bill file we are talking about what was found in both bill files. In most instances the documentation is either very similar or exactly the same.

abuses of past years and to provide additional protections to homeowners.  In our view the Legislature has effectively changed Maryland's slanted in favor of secured parties foreclosure practices to one requiring compliance with much stricter standards, tipping the playing field to protect debtors.  The appellees' attempt to shift legal fees to prospective purchasers in a manner having no relation to the trustees' duty to maximize sums at such sales is contrary to the thrust of the new policies as created by the Legislature and is another example of the abuses that have caused these types of problems in the first instance.

■ The Legislature's public policy statements as exemplified by its recent enactments persuade us a stricter adherence to the rules of procedure in mortgage foreclosure sales of residential property is required.  With that in mind we evaluate the sale in this case.

### Abuse of Discretion

We have found no Maryland cases involving the type of alleged advertisement abuse as in the present case.  The foreign cases touching on the subject are analyzed primarily in relation to the American Rule as to fee shifting.  We shall touch upon some of the cases in which there are allegations that trustees (or persons in similar capacities) have abused their discretion in respect to the time and/or manner of such sales.

■ In *Wells Fargo Home Mortgage, Inc. v. Neal,* 398 Md. 705, 726, 922 A.2d 538 (2007), we discussed the general nature of judicial sales (in that case a foreclosure under a power of sale).

"This 'power of sale' foreclosure is 'intended to be a summary, in rem proceeding' which carries out 'the policy of Maryland to expedite mortgage foreclosures.'[12] We, howev-

---

**12.**  As we indicate elsewhere, in light of the recent statutes it is no longer the policy of the State to expedite the foreclosure process in respect to residential mortgages or deeds of trust but to restrict or delay

er, do not construe the Rule governing power of sale foreclosures to prohibit mortgagors from raising viable defenses to a foreclosure to which the mortgagee is not entitled...."

*Id.* at 726, 922 A.2d at 550 (internal citation and quotation marks omitted).

In *Pizza v. Walter*, 345 Md. 664, 694 A.2d 93 (1997), two of the exceptions taken to the sale were that the property was not sufficiently advertised and that the trustee "was not an independent officer of the court and had loyalties adverse to the owner of the property and to the exceptant." *Id.* at 672, 694 A.2d at 97. In discussing supersedeas bond requirements, and quoting from prior cases, we noted:

"This Court has recognized two exceptions to this general rule protecting a bona fide purchaser from reversal of the ratification of the sale in the absence of a supersedeas bond. First, a bona fide purchaser may be affected by a reversal of ratification when 'there is unfairness or collusion by the purchaser in the making of the sale by the trustee.' Second, the rule does not apply when a mortgagee purchases at the foreclosure sale and exceptions are taken to the sale. 'This is so because a mortgagee who buys at a foreclosure sale does not free himself from the underlying dispute to which he is a party, and with the land in his hands, there is no reason why he should not be bound by a decision of the court requiring delivery of the property.'

Several of our sister states have similarly refused to find bona fide status when the subsequent purchaser of property at a foreclosure had notice of the defects of the sale." *Id.* at 674, 675, 694 A.2d 93. (Internal citations omitted.)

We went on to comment that:

"Hartman [the bank's attorney] stands in no better position than did the Bank. Given his extensive involvement

---

the process. The constitutionality of the various statutes has not been finally litigated and constitutional issues are not adequately presented in the case at bar.

with the foreclosure proceeding, his participation in preparing an inadequate advertisement, and the ambiguity as to whether he was the purchaser, Hartman cannot be considered a bona fide purchaser for the purpose of the Motion to Dismiss...." *Id.* at 677, 694 A.2d 93.

We discussed the trustee's duties further, stating:

"The trustee has a duty to protect the interest of all concerned persons to the foreclosure sale *and to use reasonable diligence in producing the largest revenue possible for the mortgaged property.* The trustee's duty extends to the mortgagor and persons claiming under or through the mortgagor to exercise the same degree of care that a prudent person of ordinary business judgment would use when selling property to see that the best price is obtained at the sale.

. . .

We also agree ... that the Trustee in this case failed to fulfill her obligation to ensure that the sale was conducted *so as to maximize the price received for the property* ...." *Id.* at 680–681, 694 A.2d 93 (Emphasis added, internal citations omitted.)

*Waters, et al. v. Prettyman, Surviving Trustee,* 165 Md. 70, 75–77, 166 A. 431, 433 (1933) was a case where multiple lots were sold as one parcel and the exceptants argued that if they had been sold separately, they would have brought a higher price. We said:

".... The test is: Was the property sold under such conditions and terms as to advertisement and otherwise, as a prudent and careful man would employ, seeking to obtain the best price for his own property. .... While the discretion in the manner and terms of sale, lodged in the trustee under the terms of the deed of trust is contractual, and gives a wider latitude to the trustees than that ordinarily allowed trustees making sales under orders or decrees of the court, yet such discretion has never been held to be unlimited. When a sale thus made is attacked, it must be shown that the trustee did not abuse the discretion reposed

in him, and that the sale was made under such circumstances as might be fairly calculated to bring the best obtainable price....

In *Gould v. Chappel [Chappell], supra,* [42 Md. 466 (1875) ] the Court ... said '.... If the sale be made under circumstances of haste and imprudence, or if the trustees fail in reasonable diligence in inviting competition, *or adopt an injudicious and disadvantageous mode of selling the property, a court of equity ought not to ratify the sale.*' " (Emphasis added.)

*Id.* at 75–76, 166 A. at 432–33. See also *Bilbrey v. Strahorn,* 153 Md. 491, 495–496, 138 A. 343, 345 (1927), which involved attempts to require payment for certain expenses including additional attorney's fees relating to postponing a sale at the request of prospective purchasers. The inclusion of the extra charges was protested. We held, as relevant here, that: "And from the view that, in proceeding with the resale ordered in this instance, the appellee was acting as such a trustee or agent of the court, it is concluded that he had no power to charge the amounts collected from the appellant, and is obliged to refund them." *Id.* at 495–96, 138 A. at 345.

In *Owens v. Graetzel,* 146 Md. 361, 370, 126 A. 224, 228 (1924), while commenting that usury objections were something normally considered at the audit stage, the Court, nonetheless, stated:

".... But the usurious charge in this case is an incident which, with a number of others, creates an atmosphere which does not impress a court of equity as being frank and fair on the part of the appellee. The appellee having it entirely in his control and power and having drawn the mortgage, *if it was the real understanding and intention of the parties that interest should be paid in advance, it should have been so expressed in the mortgage in language unambiguous and unmistakable....*" *(Emphasis added.)*

See also *Schaller, Trustee et al. v. Castle Development Corporation, et al.,* 347 Md. 90, 102, 698 A.2d 1106 (1997) "... *[I]t is appropriate for the party whose rule violation created the*

*problem to bear the burden of demonstrating that no preju-
dice resulted from the rule violation ....* [T]he rule we have
adopted, ... should accommodate a just resolution of the
controversy." (Emphasis added.) And see *J. Ashley Corpo-
ration v. Burson,* 131 Md.App. 576, 587, 750 A.2d 618 (2000),
"Consequently, 'when the purchaser at a foreclosure sale is
the mortgagee or his assignee, the Courts will examine the
sale closely to determine whether ... it was bona fide and
proper ....[and] will set aside such a sale upon "slight
evidence of partiality, unfairness or *a want of the strictest
good faith." ' "* (Emphasis added.) (Citations omitted.)

In the sheriff's sale case of *Citibank Federal Savings Bank,
et al. v. New Plan Realty Trust, et al.,* 131 Md.App. 44, 59–60,
748 A.2d. 24 (2000), involving the refusal of a sheriff to accept
certified and cashier's checks endorsed over to him as a
qualification to register to bid and where the Court found an
abuse of discretion, the intermediate appellate court said:
"The sheriff's refusal ... did not promote competition....
[R]efusing to permit her to bid at all was certainly not
designed to secure the best price at sale." [13]

The attempt in this case, and we are told in numerous other
cases, to impose an additional legal fee by a unilateral imposi-
tion in an advertisement of sale is not only unauthorized by
rule, statute, or agreement, its actual effect is the opposite of
maximizing the sums bid at the sale. It is both "injudicious
and disadvantageous." While the fee attempted to be imposed
in the present case is relatively minor, it is not subject to the

---

**13.** *Riddleberger et al. v. Goeller, Executor,* 267 Md. 64, 71, 296 A.2d 393,
397 (1972), did not involve mortgage foreclosure or judicial sales but
did involve an attempt by an executor to obtain additional sums for
performing his duties above the sums permitted under the applicable
statutes and rules. We said in that instance that "We made plain that
counsel should not be 'paid from estates for the routine work of
executors or administrators, such as opening bank accounts, procuring
appraisals, and corresponding with creditors.' For the Orphans' Court
of Baltimore County to now come along and allow a higher rate of
commission to the personal representative for the same work which
that court previously evaluated as worth a lesser amount of dollars, we
hold to be an arbitrary abuse of the discretion lodged in that court."

audit process or direct court approval in the foreclosure process and the reasonableness of such fees depends only upon the judgment of the attorneys and the lenders attempting to impose them.

We understand, as we note elsewhere, that in the current economic climate, some lenders (especially sub-prime lenders) frequently have to 'bid in' the properties they are foreclosing on, and, many such sales may not be bringing in enough funds to cover the mortgage indebtedness and costs of foreclosure. In such instances, lenders have to come up with additional funds in order to pay attorneys and other costs. The remedy in respect to this problem is not to come in at, or near, the last step in the process and attempt to extract money from buyers at foreclosure sales, but to make good loans in the first instance. There is a price for not conforming to good banking or lending standards.[14] Whatever the cause, that price is now being paid.

---

**14.** We recognize that at the national level, there were legislative pressures to include uncredit-worthy borrowers in the real property bubble in order that they could receive the benefits of home ownership, or the benefits of profits by 'flipping' properties like others higher on the economic scale were doing. Congress wanted everyone to be in a position to be homeowners and/or in on the profit train. The *Community Reinvestment Act* required many lenders to extend credit to low and moderate income borrowers in the communities the lenders served in the same ratio that they received deposits from those types of borrowers. The *Federal Housing Enterprises Financial Safety and Soundness Act* required Fannie Mae and Freddie Mac to include in their purchases of mortgages a certain percentage of mortgages relating to low and moderate income borrowers. By 2005 52% of their purchases of mortgages had to be related to such loans.

Many lenders accommodated the wishes of Congress. In that process, normal banking and lending standards were, by some banks and other lending entities, ignored. Out of this arose the enlargement of the sub-prime market with its adjustable rate mortgages (**ARMs**) that were designed to entice prospective borrowers (who normally might not be credit-worthy in respect to regular interest rate levels when the mortgage rates were adjusted several years in the future) into mortgages at the beginning abnormally lower rates.

Virtually everyone knew that if the borrower still owned the property at the adjustment time, the adjusted rates were going to create serious problems. But everyone, especially the mortgagors, thought they would sell the properties at a profit before the time the rates were

The imposition of this additional fee is far different from the setting of the terms, manner and time of sale, and the cases in respect thereto, that couple irregularities in those areas with the requirement that the exceptant must establish that the irregularity caused the sum bid at the sale to be grossly inadequate. The imposition of such additional fees, such as those in the present case, operates contrary to the duties of trustees to maximize the sums bid at sales. It is an attempt to reduce the lender's costs of foreclosure in deficiency situations by transferring some of the costs to prospective third-party bidders.

**█** We hold that, in the absence of specific authority in the contract of indebtedness or contained in statute or court rule,

---

adjusted. Even the lending institutions that participated in creating the problem did not appear overly concerned because they were 'bundling' the mortgages and selling them, thus taking immediate profits and hopefully avoiding the inevitable losses by passing them, i.e. assigning them, to others who would buy the 'derivatives' secured by the risky mortgages. The problem, as we have seen, is that the bottom fell out of the market, and there are/were little profits to be had by homeowners in the residential real property arena. Persons who should never have been in the market in the first place are now stuck with properties they cannot afford and cannot sell and some of the lenders are stuck with properties that, at forced sale, will not bring the sums needed to pay off the indebtedness due on the mortgages. As the Task Force noted, *supra*, "Many adjustable rate mortgages (**ARMs**) taken out ... during the height of the housing and refinancing boom, are scheduled to reset to higher rates in the coming months. The higher interest rates will raise monthly mortgage payments and put many more homeowners at risk of losing their homes to foreclosure."

As we have indicated, many of the lenders tried to take profits and get rid of their bad mortgages by bundling them and selling them to others in order to reduce their exposure. At the same time 'river-boat gamblers' on Wall Street invented 'derivatives' that could be bought and sold as stocks and treated as securities. These derivatives were secured by 'bundles' of mortgages and insured by entities everyone knew were themselves undercapitalized. Thus, when Wall Street 'tanked', it was not just the Wall Street players who were hurt (although some prospered greatly), the whole house of cards came down and what had once been a corner stone of the national economy, the home market, came tumbling down as well. In the process many homeowners became the ultimate victims. It was this situation that created the impetus for the creation of *The Maryland Home Ownership Preservation Task Force*—and the ultimate adoption of many of its recommendations by the Legislature.

it is an impermissible abuse of discretion for trustees or the lenders who 'bid in' properties, to include the demand for additional legal fees for the benefit of the Trustees in the advertisement of sale, or in any other way, in that it is contrary to the duty of trustees to maximize the proceeds of the sales and, moreover, is not in conformance with state or local rules and as we have said, is against public policy.

### Conclusion

For reasons above stated, we reverse the decisions of the Court of Special Appeals and the Circuit Court for Wicomico County, Maryland ratifying the sale at issue and shall remand the case to the trial court for a resale of the premises.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WI-COMICO COUNTY MARYLAND AND TO REMAND THE CASE TO THAT COURT FOR PROCEEDINGS CONSIS-TENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE APPELLEE.**

HARRELL and BARBERA, JJ., Concur.

HARRELL, J., concurs, in which BARBERA, J., joins.

I join the result reached in Judge Cathell's opinion for the Court, but based only on the reasoning regarding the absence in the loan documents, the Deed of Trust, the Note, and the Maryland Rules of authorization to charge the pertinent fee.

Judge BARBERA authorizes me to state that she joins in the views expressed here.